**Harold WILLIAMS, et al.,
Plaintiffs, Appellees,**

v.

**William LESIAK, et al.,
Defendants, Appellants.**

**No. 86–2109.**

United States Court of Appeals,
First Circuit.

Argued May 5, 1987.
Decided July 7, 1987.

Alexander G. Gray, Jr., Sp. Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for defendants, appellants.

David P. Novello with whom Victor Bass, Steven L. Schreckinger and Palmer & Dodge, Boston, Mass., were on brief, for plaintiffs, appellees.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This action is the latest stage in a fifteen-year old lawsuit concerned with the remedying of conditions at Massachusetts' Treatment Center for Sexually Dangerous Persons. Defendants-appellants are the Massachusetts Commissioner of Correction, the Superintendent of the Massachusetts Correctional Institution at Bridgewater, the Assistant Deputy Superintendent, the Senior Correctional Officer and the Massachusetts Commissioner of Mental Health. Plaintiffs-appellees are residents at the Center. Defendants brought this action as a Rule 60(b) motion for relief from a January, 1978, order of the district court. The order required defendants to administer an Authorized Absence Program (AAP) at the Center in accordance with a set of regulations known as Part 408. Defendants now seek to administer the AAP in accordance with a recently adopted Massachusetts statute, Mass. Gen.L. ch. 123A, § 8 (1986). We remand to the district court because the record provides an insufficient basis for us to decide whether the district court's denial of the Rule 60(b) motion was proper.

I.

The Amended Complaint in this case was filed in November, 1972. It alleged, *inter alia*, that "work, job training programs and educational facilities (both inside and outside the institution) are almost non-existent for 'patients' at the Treatment Center.... The programs at the Treatment Center are substantially inferior to those existing at correctional institutions of the Commonwealth." The complaint claimed that these conditions violated the fifth, eighth and fourteenth amendments to the United States Constitution.

Consent decrees were entered in the district court in 1974 and 1975. The first decree, entered in June, 1974, provided, in general outline, for the division of responsibilities between the Departments of Correction and Mental Health, for the implementation of vocational and other programs, and for the drafting of rules and regulations to apply to patients at the Center. The second consent decree, entered in January, 1975, ordered the submission of a plan including

a detailed description of the therapeutic, educational, vocational, and avocational programs to be provided by the Department of Mental Health to patients of the Treatment Center and a provision for the day or other short-term release programs outside the Treatment Center where such release is deemed appropriate by the Department of Mental Health.

In March, 1976, the district court ordered the implementation of regulations that had been drafted pursuant to this provision of the 1975 decree:

> [D]efendant Commissioner of Mental Health ... [shall] make effective immediately Part 408, the provisions for authorized visits and absences, contained in the proposed regulations for the Treatment Center as filed in this action pursuant to the requirement of paragraph 2 of the partial consent decree dated January 2, 1975.

Several court hearings followed this order. The hearings resulted in various changes to Part 408, some stipulated by the parties, others ordered by the court. In January, 1978, the district court entered a "Memorandum and Order Establishing Regulations for Authorized Absences," in which the court stated that it finds that the draft of October 11, 1977, accurately sets forth the parties' stipulations and orders of the court and complies with the provision of the [1975] partial consent decree ... and ORDERS that its provisions be implemented forthwith by the several parties defendant, their agents and employees.

The AAP is governed to this day by this 1978 court order that required the implementation of Part 408.

In May, 1980, defendants filed a Rule 60(b) motion for relief from the 1978 order. Defendants sought to administer the AAP under new regulations drafted by the Department of Mental Health. They moved that the court permit the filing of the proposed regulations with the Secretary of the Commonwealth so that they could eventually be enacted in accordance with the state Administrative Procedure Act, Mass.Gen.L. ch. 30A (1978). In short, defendants requested "to be relieved from the [1978] Court Order ... and allowed to promulgate regulations according to the terms and provisions of state law."

The district court rejected the motion. Rather than discussing the more general request to replace the federal court order with state-promulgated regulations, the court based its ruling on an analysis of the four specific ways in which the draft regulations departed from Part 408. It rejected two of the proposed changes unconditionally. It denied the other two proposed changes on the grounds that defendants had failed to show that circumstances had changed sufficiently to warrant relief under Rule 60(b):

> We had protracted hearings [prior to the issuance of the 1978 order], and we certainly cannot make changes in the substantive rights that were granted these petitioners after such an investigation of the facts and the needs and the law without a far greater showing than what has been made by the defendants here in connection with their motion filed May 5, 1980.

On August 8, 1986, the district court denied a motion by plaintiffs for an order again requiring defendants to operate the program in accordance with Part 408. The court found that various violations of the regulations had occurred in the past, including unwarranted delays in processing applications for participation in the AAP. The court found, however, that the situation had begun to improve with the appointment of Ian Tink as acting administrator of the Center in March, 1986. The court stated that "[o]ne may hope with reason that progress will continue." The court also found that control of the Treatment Center had not been transferred to the Department of Correction. The court concluded that no additional order was necessary due to Tink's efforts to improve conditions.

On August 14, 1986, defendants filed another Rule 60(b) motion, the denial of which forms the subject of the present appeal. Defendants sought relief from the 1978 court order to allow them to administer the AAP in conformity with a recently enacted Massachusetts statute, St.1985, c. 752, § 1, subsec. 8, codified at Mass.Gen.L. ch. 123A, § 8 (1986). The statute was approved on January 6, 1986, and went into effect ninety days later.

For the first time as a matter of state law, the new statute mandates a program for the "restrictive integration of the patient into a non-custodial environment." It thus overlaps with some of the provisions

of Part 408. Unlike Part 408, though, the statute, with a few exceptions, does not itself contain detailed regulations for the program. Rather, the statute describes the program in general terms and states that "said program shall be administered pursuant to the rules and regulations promulgated by the department of mental health."

In their Rule 60(b) motion, defendants noted three ways in which the statute conflicts with the 1978 court order. First, the statute and Part 408 conflict with regard to the status of one member of a board that, according to both, is to be involved in the determination of eligibility for the program. Part 408 calls this board the "Pre-Release Review Board"; the statute calls it the "restrictive integration review board." The statute and Part 408 have identical provisions regarding five of the six members of the board. These five members, all with voting status, include two members of the Center's clinical staff and three other individuals, not employees of the Center, of whom one must be a psychologist, the second a psychiatrist, and the third either a psychologist or a psychiatrist. The sixth member of the board, under both the statute and Part 408, is the head of the Treatment Center Custodial Staff, an office affiliated with the Department of Correction. Under Part 408 this individual is a nonvoting member of the board; the statute, however, grants him voting rights.

The second conflict concerns the length of time a patient must reside at the Center before he may become eligible for the training program outside the institution. The statute provides that patients at the Center shall be eligible for the program of "restrictive integration into a non-custodial environment" after at least two years of custody; Part 408 allows participation in the AAP after only one year.

Finally, defendants claim that the general provision in the statute that rules are to be promulgated by the Department of Mental Health conflicts with the court order as a whole because the order requires that the program be run according to the regulations contained in Part 408. This last "conflict" between the statute and Part 408 is of a more far-reaching nature than the first two differences; it calls into question Part 408 as a whole rather than the detail of its provisions.

Defendants sought two forms of relief from the district court. First, they sought to have the 1978 court order mandating the implementation of Part 408 vacated in order to enable the program to be administered wholly under the state statute and the regulations to be promulgated pursuant to the statute. In the alternative, they sought to have Part 408 modified with regard to the two specific conflicts with the statute: the two-year eligibility requirement and the voting status for the custodial member of the board. Defendants did not ask, in either request for relief, that the underlying consent decrees be vacated.

At oral argument before us, defendants' counsel stated that he would accept a third, hybrid solution. Under this proposal, Part 408 would remain in effect while the Department of Mental Health promulgated regulations under state law. Part 408 would be replaced by the new regulations only after the district court reviewed them to ensure that they were consistent with the consent decrees and constitutional principles.

## II.

The parties have vigorously contested the legal standards governing this case. Their disagreement concerns the standard the district court should have applied in considering the Rule 60(b) motion, as well as the standard of review we should apply in examining the district court's decision. In the context of this case, the disputes about the two standards are intertwined. We are required to make a rather extensive analysis because the variety of the contexts in which requests for modification of court orders arise appears to have caused some confusion about the appropriate standards to be applied both in the district court and on review.

A district court must be accorded wide discretion when it considers a motion to modify or vacate a prior order in a complex case. *System Federation v. Wright,* 364

U.S. 642, 648, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961); *Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790, 798–99 (1st Cir.1982). We have recognized that, in cases involving "public law" issues of institutional reform, " 'broad judicial discretion may well be crucial' for the district judge to secure 'complex legal goals.' " *Massachusetts Ass'n of Older Americans v. Commissioner of Public Welfare*, 803 F.2d 35, 38 (1st Cir. 1986) (quoting *AMF, Inc. v. Jewett*, 711 F.2d 1096, 1101 (1st Cir.1983)). The district court's ongoing involvement in such cases requires that it be granted considerable latitude in determining the appropriate response to requests for modification or enforcement of the original order. *Massachusetts Ass'n of Older Americans*, 803 F.2d at 38 (citing Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L.Rev. 1281, 1292–98 (1976)).

■ Discretion, however, has its limits and these limits vary depending on the reasons advanced to justify a request for modification. Thus, courts clearly have the ability to modify their orders due to a change in factual circumstances: "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). Where, however, the danger that motivated the provisions of the order is still present, a request for modification or vacation faces a heavy burden:

> "The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

*Fortin*, 692 F.2d at 799 (quoting *United States v. Swift & Co.*, 286 U.S. at 119, 52 S.Ct. at 464). Of course, where the order has proved to be a faulty method for accomplishing the goal for which it was designed, it would be error for a district court to refuse to grant a modification. *See United States v. United Shoe Corp.*, 391 U.S. 244, 249, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968).

■ In cases involving a change in the statute which the court order was meant to enforce, the order must be modified when a failure to do so would enforce "rights the statute no longer gives." *System Federation*, 364 U.S. at 652, 81 S.Ct. at 373. The limits to a district court's discretion in such cases "are often far clearer to the reviewing court" than in the context of a change in facts. *Id.* at 648, 81 S.Ct. at 371. A court would abuse its discretion if it continued to enforce statutory provisions that have been repealed by the legislature.

While the foregoing principles may be clearly stated, they do not directly govern the present case. Defendants have strenuously argued that this case presents a change in law warranting a modification or vacation of the order under *System Federation*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349. *System Federation* and the cases relying on its holding, however, all involved changes in the statutes the court orders were meant to enforce. *See, e.g., Williams v. Atkins*, 786 F.2d 457 (1st Cir.1986). The court order in the present case, by contrast, was based on rights guaranteed by the fifth, eighth and fourteenth amendments to the United States Constitution. The "change in law" here is a state statute adopted long after the court order, though overlapping it in subject matter.

Therefore, because of the context of this case, the principles outlined above must be supplemented by other considerations. We note, first, that a state statute that has the effect of thwarting a federal court order enforcing federal rights "cannot survive the command of the Supremacy Clause of the United States Constitution." *Washington v. Fishing Vessel Ass'n.*, 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979) (citations omitted).[1] Where, how-

---

1. *See also Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.): "[T]he separation-of-powers

ever, the conflict between the goals and provisions of the state statute and the federal court order is less than clear, delicate questions of federalism must enter into our inquiry. *Cf. Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976) (federalism must be considered in determining the scope of equitable relief). A hybrid inquiry, involving close attention to both factual and legal detail, is required.

We have had occasion to conduct such inquiries in *Coalition of Black Leadership v. Cianci,* 570 F.2d 12 (1st Cir.1978), and *Massachusetts Ass'n for Retarded Citizens v. King,* 668 F.2d 602 (1st Cir.1981). *Cianci* involved a consent decree providing for procedures governing civilians' complaints against police officers. A state statute was subsequently passed covering the same subject and partially conflicting with the consent decree. We refused to vacate the decree. We found that, whereas the decree was intended primarily for the benefit of civilian complainants, the statute was meant to safeguard the rights of accused police officers. *Cianci,* 570 F.2d at 14. We noted that there had been no showing that

> the additional incremental requirements imposed by the consent decree but not mandated by the new state legislation are so onerous that they amount to unfair hardships inflicted on police officers and yet are so marginal that they provide no additional protection to civilian complainants.

*Id.* We held that the mere "fact that the new legislation might accomplish much of what a consent decree was designed to achieve cannot be viewed as justification for vacating the decree." *Id.* Finally, we took note of the district court's willingness to safeguard the rights of police officers in its enforcement of the decree; we found significant the court's "flexibility" on this point. *Id.*

In *King,* on the other hand, we found that a consent decree, when interpreted flexibly, did not conflict with an overlapping statute. We, therefore, overturned a preliminary injunction because we found

principle ... has no applicability to the federal

it unlikely that the statute would be found unlawful due to the supremacy of the federal court order. We summarized our manner of treating the consent decree by stating that *King* was a case

> where the language of the decree does not conflict with the statute at issue, where the statute does not appear directly to impede the basic objective of the decree and where a contrary interpretation was likely to provoke a direct confrontation between a federal court and a state legislature exercising its fiscal power....

*King,* 668 F.2d at 610.

Thus, in *Cianci* and *King* we outlined a set of considerations for handling overlapping court orders and subsequent state statutes. These considerations all focus on a careful reading of both the order and the statute to discover whether their objectives and provisions necessarily conflict and to consider the importance of the areas of conflict to the overall goals of the litigation. Rather than draw a bright-line rule, we have outlined a careful case-specific inquiry that must be sensitive to the goals of the decree and the legislation, as well as to the values of federalism.

### III.

■ Due to the foregoing considerations, we would have to rely heavily on the district court's views on the ways in which the rather abstract legal issues argued before us relate to the actual administration and goals of the AAP as seen against the background of the years of litigation and the various orders and decrees entered in this case. The Massachusetts district court has been handling this case for fifteen years; Judge McNaught, who wrote the opinion now on appeal, has been involved in various aspects of the case since 1979. It would be incongruous for us to upset the delicate balances struck by the court and the parties during years of litigation without a full understanding of the stakes underlying the various issues implicated in this appeal. Unfortunately, however, the district court's

judiciary's relationship to the states."

opinion was exceedingly brief and even, in part, enigmatic.

The court rejected defendants' general contention that the objectives of the underlying consent decree would not be frustrated by the modification of the order. The court did not specify, however, the ways in which these objectives would be thwarted by modifying the order to conform with the statute. The court further ruled that this case was governed by our decision in *Cianci*, 570 F.2d 12. We understand this citation of *Cianci* to refer, in the first instance, to the general proposition that the subsequent adoption of an overlapping state statute does not, without more, constitute justification for modifying a federal court order. The court went on to make two points related to the *Cianci* analysis. First, it found that the court-ordered regulations were not burdensome, citing Tink's testimony at the hearing preceding its August, 1986, decision. Secondly, it found that the goals of the court order and the state statute were different: while the order was designed to protect the federal constitutional rights of plaintiffs, the "statute enacted recently does *nothing* by way of preserving or protecting those rights." (Emphasis added.) It found, therefore, that the statute was not a sufficient change in circumstances to warrant granting a Rule 60(b) motion. The court did not explicate its reasoning for concluding that the statute did "nothing" to protect plaintiffs' rights.

The terseness of the district court's opinion necessitates that we conduct an extended analysis of the specific conflicts between the statute and the order. The first conflict concerns the status of the custodial member of the board. The statute, unlike the order, would grant that individual voting rights on the board. Plaintiffs contend that this change would conflict not only with the provisions of Part 408 but also with the terms and goals of the first partial consent decree, adopted in 1974.

Plaintiffs' claim appears to be well-grounded in the language of the 1974 decree. The decree states in pertinent part:

1. The Treatment Center at M.C.I. Bridgewater *shall be treated as a facility of the Department of Mental Health.*

2. *Primary responsibility and authority* for the Treatment Center shall be exercised by the Department of Mental Health.

3. All personnel at the Treatment Center (clinical, custodial, administrative) shall be subject to *the control of the Commissioner of Mental Health with respect to the handling of patients.*

4. Custodial personnel, *but not patients*, shall be under the administrative, operational and disciplinary control of the Commissioner of Correction.

5. The Department of Mental Health shall exercise the responsibility and authority set forth in paragraph 2 above so that the patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purpose of commitment. To implement this and other provisions of this decree, the Department of Mental Health shall forthwith take steps jointly and in cooperation with the Department of Correction ... to do the following:

a. Improve the physical plant....[2]

b. Implement a meaningful work program and increasing avocational activities....

c. Have a system of differing security for different categories of patients....

It is understood that any budget proposal shall be the result of collaboration and cooperation between the Departments of Mental Health and Correction.

6. The Department of Mental Health and the Department of Correction will also act in concert to draw up and promulgate certain rules and regulations to apply to patients at the Treatment Center.... [Emphases added.]

**2.** The terms of subsection 5(a) were superseded by the provisions of the second consent decree, entered in January, 1975.

Thus, the first four paragraphs of the decree are devoted to stressing that primary authority over patients at the Treatment Center is to be vested in the Department of Mental Health. Indeed, paragraph 4 specifically excludes patients from the "administrative, operational and disciplinary control of the Commissioner of Correction." In light of this clause, the provisions in paragraphs 5 and 6 for the collaboration of the Departments of Correction and Mental Health appear to concern only general matters such as budgetary issues and the drawing up of general rules governing the program. The decree appears to have envisaged that day-to-day responsibility for patients would lie exclusively with the Department of Mental Health. We also note that the district court's finding that control of the Center had not passed to the Department of Correction entered into its decision not to issue a new order against defendants in August, 1986.

In order to determine whether giving voting rights to the custodial member of the board could constitute a significant violation of the goals of the decree and the provisions of the order, we turn to an examination of the exact role prescribed in Part 408 for the Pre-Review Release Board (PRRB). Under Part 408.05, the original recommendation concerning a patient's application to participate in the AAP is made by a staff member at the Center. A negative report by a staff member may be appealed by the patient to the PRRB. Positive recommendations are also passed on to the PRRB. The PRRB may approve or disapprove of the patient's application and may also specify certain "conditions of release." If the PRRB makes a negative finding, the patient's application *proceeds no further in the administrative process.* A positive recommendation is passed on to the Administrator. The Administrator may approve or deny the application. The Administrator may also modify the conditions of release recommended by the PRRB "but only insofar as such modifications make those conditions equally or more stringent." This examination of Part 408.05 shows that the PRRB can play a determinative role both in the success of applications and in the specification of the conditions of release.

The granting of voting rights to the custodial member of the PRRB might, therefore, make a decisive difference in the processing of individual applications. We, however, find it difficult to determine the likelihood of this and its significance in the actual administration of the program. For example, although we may engage in speculation, we are offered little guidance in the record as to the precise reasons that the consent decree was so emphatic about vesting authority in the Department of Mental Health and how those reasons would affect the status of the custodial member of the PRRB. Yet, we would need to understand those reasons fully to determine whether the statute threatens to undermine the goals of the decrees. Nor does the record offer anything about the considerations that have gone into the PRRB's processing of applications in the past and whether they are of a nature such as to suggest that the custodial member would be likely to evaluate applications in a significantly different way than those members affiliated with the Department of Mental Health. A full consideration of these issues is crucial for a determination of the reality and significance of the conflict between the goals and essential provisions of the statute, the consent decrees and the court order.

We turn to the second conflict between the order and the statute, the extension of the residency requirement to two years before a patient can be eligible for the AAP. Our attempt to understand the significance of this issue is again frustrated by the district court's failure to make specific factual findings. We do not know whether the Center, operating under Part 408, has in fact allowed any patients to participate in the program before two years of residency or whether it would be likely to do so in the future. If it is extremely unlikely that any patient will ever be allowed to do so, and if that fact is based on justifiable considerations, then the difference between the order and the statute on this point is largely academic. On the basis of the

record before us, however, we have no way of knowing. Defendants' counsel claimed at oral argument that no patient is accepted within that time period; plaintiffs' counsel thought that some patients were accepted before two years had elapsed. Plaintiffs' counsel also claimed that more patients would have been accepted within that time period but for the Center's inefficiency in processing applications. It is clear that specific factual findings are necessary to make possible an intelligent resolution of this issue.

To be sure, defendants point out that, at the time the suit was brought, plaintiffs did not have a constitutional right to a *specific* AAP but only to a program that passed constitutional muster. Depending on factual details which we do not have, however, the two points of conflict discussed above might be of critical significance. The extent of control exercised by the Department of Correction appears to have been an important consideration when the first decree was formulated. Similarly, the time frame for accepting patients into the AAP has repeatedly been an issue during this litigation. Delays in the processing of applications appear to have plagued the implementation of the program at least until March of last year. Increasing the residency requirement to two years might further violate the first consent decree's goal of providing patients with the "least restrictive conditions necessary to achieve the purpose of commitment." Again, a factual inquiry, concerned with the significance of the length of the residency requirement, is necessary.

Furthermore, particularly in the context of institutional reform, the specifics of a court order remedying constitutional violations do not necessarily derive from the Constitution with the rigor of a mathematical proof. Rather, a whole series of prudential considerations enter into the formulation of such orders.

> It is these considerations [of efficacy and fairness] that block the attribution of these specifics "back into" the Constitution. The rights these considerations give rise to might be thought of as instrumental or remedial rights rather than constitutional rights proper, but it is equally important to recognize that these instrumental or remedial rights are created by courts in discharge of their constitutional function.

Fiss, *The Supreme Court, 1978 Term, Foreword: The Forms of Justice*, 93 Harv. L.Rev. 1, 50 (1979). *See also* Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. at 1293–94. The question is not whether the original suit would have succeeded if the current statute had been in place and was functioning according to the letter of the law. Rather, the question is whether the dangers that gave rise to the adoption of Part 408 have lessened to such an extent that the constraints of federalism should lead to the modification of the court order. This requires a factual inquiry which we find ourselves unable to conduct on the basis of the record. Such factual findings would provide the starting point for the delicate balancing required in deciding how to resolve the tension between the state statute and the court order.

## IV.

The third "conflict" between the 1978 order and the statute is of a more fundamental character than the two already discussed and lies at the heart of this action. The statute provides that the program "shall be administered pursuant to the rules and regulations promulgated by the department of mental health." The court, on the other hand, ordered in 1978 that the program shall be administered according to Part 408. Defendants seek to vacate the 1978 order to allow the state to administer its own program according to rules duly promulgated by state procedures. Defendants stated at oral argument that they would be willing to submit these rules to the district court before their final promulgation.

On its face, defendants' request has much to recommend it. Generally, it is preferable that a state program operate under constitutional state procedures than under a federal court order. We also appreciate defendants' willingness to accept

relief that would involve the submission of any new rules to the district court. Of course, such an arrangement would not, as a practical matter, differ greatly from the present situation in which any request for modification of Part 408 requires a motion before the district court.

The policy argument underlying defendants' request has been at issue in this litigation, at least implicitly, since its inception. For example, according to defendants' counsel, prior to the 1978 court order, the Part 408 regulations were set to go through the state APA notice and comment process for promulgation. The district court, however, ordered that Part 408, as modified by the various stipulations and orders, be implemented in its draft form, rather than be submitted to the state promulgation process.[3] Presumably, the court was alert to the issues of federalism implicated by its decision. Nonetheless, the court decided that the other issues raised by the case required that it order that Part 408 be implemented in its draft form. No appeal was taken from this decision.

Defendants' 1980 Rule 60(b) motion again implicated the policy argument of allowing the state to run its own program under its own rules and procedures. The court again apparently thought that the importance of the Part 408 provisions overrode such policy considerations. Indeed, rather than discuss at length the more abstract issue raised by defendants' motion, it focused on the specific ways in which defendants' new proposed regulations departed from Part 408. The court thus treated the motion as a request for specific modifications of the 1978 order, rejecting out of hand defendants' more fundamental request to be relieved from the 1978 order in order to promulgate state regulations "according to the terms and provisions of state law." In denying the motion, the court stressed the detailed inquiries that preceded the adoption of Part 408 in its current form. "[A]fter such an investigation of the facts and the needs and the law," it declared, any request to modify Part 408

would face a heavy burden. The motion was denied and no appeal was taken.

The district court's reasoning on the issue of specific modifications of Part 408 applies *a fortiori* to a blanket request to vacate Part 408 in favor of a wholly new set of regulations. Assuming such regulations would be submitted to the district court, that court would be constrained to conduct the same kind of "protracted hearings" it found necessary prior to the 1978 court order. We note that over a year and a half elapsed between the inception of the lawsuit and the first consent decree. It took an additional three and a half years to translate the generalities of that decree into the final court order requiring the implementation of the concrete details of Part 408. Over the last nine years, various judges have been involved in hearings and motions concerned with the enforcement of those regulations. In the absence of a substantial change of circumstances, any proposal to do away with Part 408, especially if new court hearings are required, would have to justify the reduplication of the considerable time and effort already expended in formulating and enforcing regulations for the governance of the AAP.

When read in the light of this history of the district court's treatment of the tension between Part 408 and state procedures, the court's rulings on the present motion take on a sharper focus. The district court stated that the new state statute "does nothing" to protect plaintiffs' constitutional rights. The court was undoubtedly comparing the detailed provisions of Part 408, adopted after the extended labor of hearings, stipulations and court orders, with the statute's merely programmatic statement that the AAP would be administered according to not yet existing state regulations. After such a comparison, it is only somewhat hyperbolic to say that the statute "does nothing" to protect plaintiffs' rights. It is understandable that the district court would be reluctant to scrap existing regulations, which the courts and the

---

**3.** Regrettably, counsel did not submit the documents showing this sequence of events. Plaintiffs, however, do not appear to contest this procedural history which took place when Judge Garrity was in charge of the case.

parties have been trying to implement since 1978, in favor of some hypothetical substitute.

Nevertheless, the considerations of federalism, implicitly at stake throughout this litigation, have become considerably more important due to the directives of the new statute. We think, therefore, that defendants' requests for relief deserve careful consideration, consideration that would view the legal principles in the context of the factual background. We are, however, bereft of the facts necessary to decide whether defendants' requests for relief should be granted.

The factual findings necessary to make this decision include the history of the administration of the program under Part 408. Defendants state in their brief that "[t]he wisdom and experience of [programs like the AAP] should be determined by the appropriate state officials." It is a matter for a factual inquiry, however, whether the history of the AAP since 1978 indicates that "the appropriate state officials" have shown the requisite "wisdom and experience" to warrant placing in their hands the authority and responsibility for drafting and implementing wholly new regulations governing the program. For example, in its August, 1986, decision, the district court found that, as of February, 1986, the director of clinical services at the Center

> apparently shared in an attitude that the Court Orders could be ignored if their implementation affected other activities adversely.... [H]e conceded that Center staff *COULD* have operated the authorized absence program if *"pushed"* to do so. A federal court order is, apparently, not viewed as a "push." [Emphases in original.]

The court went on to find that the appointment of Tink in March, 1986, began a process of improvement of compliance with the court orders. The court found that it had reason to anticipate that Tink's efforts to implement the goals of the program would be successful; it found that no additional order mandating compliance was necessary.

A determination of whether state officials should now be allowed to scrap Part 408 and draft and implement wholly new regulations demands a stricter investigation than that needed to decide whether to issue an order mandating compliance with regulations already existing and required by the court. We note that the improvement of compliance with various provisions of the court orders began a little over a year ago; that is not, from the perspective of this litigation, a very long time. In particular, we would need to know whether the district court's hopes for the new administration of the AAP have been borne out by the experience of the past year. We would also need to know whether the unfortunate "attitude" prevailing prior to March, 1986, should be viewed as irrevocably a matter of history. Whether state officials should be entrusted with drafting and implementing wholly new regulations depends, in part, on whether they have made the necessary efforts, and thereby gained the requisite knowledge and experience, in running the AAP constitutionally over the past several years under the court orders.[4]

On the basis of the sparse factual record submitted to us, we would be loath to intervene precipitously in a case, such as the present one, involving years of work and delicate balances and negotiations on the part of judges, counsel and parties. Intervention on our part to vacate the court order at the heart of this case, without the requisite knowledge of the factual details and a full understanding of the stakes in-

---

4. Although it is not directly on point, the case of *Morris v. Travisono*, 373 F.Supp. 177 (D.R.I. 1974), *aff'd*, 509 F.2d 1358 (1st Cir.1975), may prove useful to the district court in its consideration of this case on remand. In that case, court-ordered regulations were promulgated under a state APA. The issue was (a) whether the regulations could be suspended under the provisions of the state APA, and (b) whether an injunction would be moot under the court-ordered regulations because new regulations had been promulgated by defendants. The court rejected both arguments; in reaching its decision, it noted past violations of the regulations and ruled that the "court's power to grant relief survives the discontinuance of the illegal conduct" if there is a reasonable expectation that the conduct will be repeated. *Id.* at 184.

volved, would surely show an unwarranted lack of respect for the work expended in fifteen years of proceedings before the district court. We decline, at this stage, to play the role of a bull in a china shop.

Due to the foregoing considerations, we are remanding this case to the district court on all issues. In reconsidering the Rule 60(b) motion, the district court shall make factual findings, including, but not limited to, the inquiries outlined above.[5]

*Remanded.*

---

**5.** The court is also free to consider the various proposals for relief suggested in the course of the proceedings on this motion. It may also consider a combination of these proposals. For example, as in the decree in *Morris,* 373 F.Supp. at 179, it could order that Part 408 itself be promulgated pursuant to the Massachusetts APA. As in *Cianci, see* 570 F.2d at 14, the court should be flexible in framing a response to the motion to avoid any conflict with the state statute when unnecessary for the goals underlying this litigation.