USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-1751 MITCHELL G. KING, ET AL., Plaintiffs, Appellees, v. MILTON GREENBLATT, LESLIE TAYLOR, CHARLES W. GAUGHAN, M.C.I. BRIDGEWATER, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ William L. Pardee, Assistant Attorney General, with whom Scott __________________ _____ Harshbarger, Attorney General, and Scott M. Davis, Assistant Attorney ___________ ______________ General, were on brief for appellants. Anthony A. Scibelli, with whom Robert D. Keefe, Stephen C. _____________________ _________________ ___________ Reilly, and Hale and Dorr, were on brief for appellees The Class of 48 ______ _____________ + 1; David R. Geiger, with whom Sarah B. Reed, and Foley, Hoag & ________________ ______________ ______________ Eliot, were on brief for intervenors/appellees Donald Pearson, et al. _____ ____________________ April 6, 1995 ____________________ BOWNES, Senior Circuit Judge. This is the latest BOWNES, Senior Circuit Judge. _____________________ chapter in the institutional reform litigation brought in 1972 by plaintiff Mitchell King, then a civilly-committed patient of the Massachusetts Treatment Center for Sexually Dangerous Persons in Bridgewater, Massachusetts, to correct allegedly unconstitutional practices by the Department of Correction (DOC) at the Treatment Center. The history of the litigation has been exhaustively covered: In re Pearson, 990 _____________ F.2d 653 (1st Cir. 1993) (Pearson III), Pearson v. Fair, 935 ___________ _______ ____ F.2d 401 (1st Cir. 1991) (Pearson II), Langton v. Johnston, __________ _______ ________ 928 F.2d 1206 (1st Cir. 1991), Williams v. Lesiak, 822 F.2d ________ ______ 1223 (1st Cir. 1987), and Pearson v. Fair, 808 F.2d 163 (1st _______ ____ Cir. 1986) (per curiam) (Pearson I). We review the case __________ history only to put this appeal in perspective. I. I. __ King alleged that he had been deprived of due process and other federal constitutional rights by the defendants, specifically by officials of the DOC, who allegedly placed him in solitary confinement without notice of the charges against him or a meaningful opportunity to be heard. DOC's actions allegedly interfered with King's treatment by the Department of Mental Health (DMH), the agency vested with primary jurisdiction over the Treatment -2- 2 Center. See Mass. Gen. L. ch. 123A, 2.1 Thus, an element ___ of this litigation, present from the very beginning, has been DOC's alleged usurpation of DMH's statutory authority over patients at the Treatment Center, during which usurpation the patients' constitutional rights were allegedly violated. Invoking both the Federal Constitution and state law, King sought declaratory and injunctive relief from the DOC's sequestration practices. In 1974, the district court held a hearing on King's allegations and entered a consent decree that provided, in relevant part: 1. The Treatment Center at MCI Bridgewater shall be treated as a facility of the Department of Mental Health. 2. Primary responsibility and authority for the Treatment Center shall  ____________________ 1. Section 2 of ch. 123A (as amended through St. 1959, ch. 615) provided in pertinent part: "The commissioner of mental health shall establish and maintain, subject to the jurisdiction of the department of mental health, a treatment center . . . at a correctional institution approved by the commissioner of correction, for the care, custody, treatment and rehabilitation of [sexually dangerous] persons . . . . The commissioner of correction shall appoint such custodial personnel as may be required for such center. Such custodial personnel shall be subject to the control of the commissioner of mental health with respect to the care, treatment and rehabilitation of persons in their custody, but shall at all times be under the administrative, operational and disciplinary control of the commissioner of correction. The commissioner of mental health shall appoint to such center, in addition to the personnel appointed by the commissioner of correction, adequate personnel for the care, treatment and rehabilitation of such persons committed to their care." -3- 3 be exercised by the Department of Mental Health. 3. All personnel at the Treatment Center (clinical, custodial, administrative) shall be subject to the control of the Commissioner of Mental Health with respect to the handling of patients. 4. Custodial personnel, but not patients, shall be under the administrative, operational and disciplinary control of the Commissioner of Correction. 5. The Department of Mental Health shall exercise the responsibility and authority set forth in subparagraph 2 above so that patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment. . . . The first four paragraphs of the consent decree closely track the requirements of ch. 123A, 2, the law in effect when the consent decree was entered.2 Over time, the residents of the Treatment Center brought various suits to enforce or to modify the consent decrees. In 1988, the Commonwealth sought unsuccessfully to vacate the decrees. "The stream of litigation occasionally overflowed the district court," Pearson III, 990 F.2d at 655, ___________ and this court as well.  ____________________ 2. The district court also entered a supplemental consent decree that (1) prohibited defendants from using solitary confinement for the purposes of discipline or punishment; and (2) imposed various procedural and substantive requirements for the use of sequestration. The defendants do not seek to modify the supplemental consent decree. -4- 4 While the residents were attempting to enforce the consent decrees, forces on the sidelines of the litigation were mobilizing to amend ch. 123A. Beginning in 1986, Massachusetts' executive branch filed a number of legislative bills that sought to transfer control of the Treatment Center from DMH to DOC. None of these bills were adopted until 1994, when the Massachusetts legislature enacted St. 1993, ch. 489. Chapter 489 purports to transfer all authority over the Treatment Center to the DOC, in direct contravention of the first five paragraphs of the consent decree. Section 2 of ch. 489 provides that "[t]he commissioner of correction shall maintain subject to the jurisdiction of the department of correction a treatment program or branch thereof at a correctional institution for the care, custody, treatment and rehabilitation of persons [ad]judicated as being sexually dangerous." The defendants immediately moved under Fed. R. Civ. P. 60(b)(5) to modify the decree so that DOC might assume plenary authority over the Treatment Center, subject to all other substantive and procedural requirements of the decree.3 Their sole argument was that the Massachusetts legislature's enactment of ch. 489 constituted "a significant  ____________________ 3. The defendants also moved to reopen Williams v. Lesiak, a ________ ______ related litigation that involved a similar consent decree. See Williams, 822 F.2d at 1224. The district court did not ___ ________ rule on the motion because counsel had not yet been appointed for the plaintiffs in Williams. ________ -5- 5 change in circumstances warrant[ing] revision of the decree." See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 ___ ____ ______________________________ (1992) (setting forth standard for modification of consent decrees, and reversing the decision of this circuit). The district court denied the motion from the bench: "On the record that is now before me, and incorporated into that record, everything that I have learned about the case and found in the case from the trials of the Bruder and the Pearson cases [companion cases], I will ______ _______ conclude at this time that the defendants have not sustained their burden of showing a significant change in law or fact under Rufo." The court also made the following findings: ____ I do find that the consent decrees sought to address federal constitutional violations articulated by King and in ____ Williams [a related case]. ________ A critical component of the remedy provided by the consent decrees was that the Department of Mental Health was in control of the Treatment Center which was to provide, in part, a check on the Department of Correction[,] which compromised treatment. I conclude that the Department of Mental Health is an essential part of the decree, and on the record before me at this time, the Department of Correction has done nothing yet that I can see which warrants my placing confidence in its ability to deliver . . . patient treatment. I conclude at this time that the Department of Correction's control of the Treatment Center compromises the federal constitutional remedy which the consent -6- 6 decree sought to impose, and would compromise the federal constitutional rights which the consent decrees sought to protect. . . . . Will the Department of Correction provide th[e] same treatment [as DMH]? That's not shown. If they were to provide that treatment, if there were to be a case-specific inquiry in what the Department of Correction was going to do and proposed to do, then perhaps I would be able to rule otherwise. But at this point, there is not that showing. . . . The district court invited the Commonwealth to propose ways to modify the decree that would preserve the federal constitutional remedies, and yet accommodate the change in the underlying state law. It noted, however, that "we're not going to go anywhere" before the defendants have tested the court's interpretation of Rufo on appeal.4 Undeterred, the ____  ____________________ 4. We asked the parties to brief the issue of our appellate jurisdiction in light of Carson v. American Brands, Inc., 450 ______ _____________________ U.S. 79, 84 (1981), which, in the context of an appeal from an interlocutory order refusing to enter a consent decree, _____ applied the general rule that an appeal under 28 U.S.C. 1292(a)(1) is available only if the order "might have a 'serious, perhaps irreparable consequence,'" and can be "'effectually challenged' only by immediate appeal" (citations omitted). Assuming, without deciding, that these conditions apply where the district court refuses to modify a ______ longstanding consent decree, we think the appeal is properly before us. In particular, the district court's forecast of a stalemate pending appeal suggests that its order can be effectually challenged only by immediate appeal. We also note that Rufo itself was an interlocutory appeal ____ from the denial of a Rule 60(b)(5) motion to modify a consent decree. Neither the Supreme Court nor we, however, addressed the jurisdictional issues in that case. -7- 7 defendants filed a renewed motion for modification and a motion to vacate the consent decrees while this appeal was pending. II. II. ___ We review the district court's application of the Rufo standard, and the more general requirements for granting ____ relief from a final judgment under Rule 60(b)(5), for errors of law or abuse of discretion. See Alexis Lichine & Cie. v. ___ _____________________ Lichine Estate Selections, Ltd., No. 94-1918, slip op. at 10 _______________________________ (1st Cir. Jan. 30, 1995). Rufo held that "a party seeking ____ modification of a consent decree bears the burden of establishing that a significant change" in either factual conditions or in law "warrants revision of the decree." 502 U.S. at 383-84. If the moving party meets this standard, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." Id. at ___ 383. This "standard . . . applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right." Id. ___ at 383 n.7. Rufo instructed district courts to "exercise ____ flexibility in considering requests for modification of . . . institutional reform consent decree[s]" because such decrees "'reach beyond the parties involved directly in the suit and -8- 8 impact on the public's right to the sound and efficient operation of its institutions.'" Id. at 381, 383 (quoting ___ Heath v. De Courcy, 888 F.2d 1105, 1109 (6th Cir. 1989)). We _____ _________ have echoed these concerns. See, e.g., Pearson III, 990 F.2d ___ ____ ___________ at 658 ("In institutional reform litigation, injunctions should not operate inviolate in perpetuity."); Mackin v. City ______ ____ of Boston, 969 F.2d 1273, 1275 (1st Cir. 1992) ("we believe _________ that district courts should be flexible in considering requests for relaxation of, or release from, decrees which were initially established to bring about needed institutional reforms"), cert. denied, 113 S. Ct. 1043 _____ ______ (1993). Notwithstanding the application of this "less stringent, more flexible standard," a modification "must not create or perpetuate a constitutional violation." Rufo, 502 ____ U.S. at 380, 391. III. III. ____ We shall refer to the first five paragraphs of the 1974 consent decree as "structural" terms, inasmuch as they incorporate the administrative structure mandated by state law. These are the only terms the defendants seek to modify. For the purposes of their motion, the defendants assume that the structural terms "arguably relate[] to the vindication of a constitutional right." Id. at 383 n.7. Of ___ course, if the terms at issue were directly mandated by the ________ Constitution, a change in state law without more would not -9- 9 warrant a modification. Modifiable terms will typically fall somewhere along a spectrum: in general, terms that directly implement constitutional requirements -- e.g., a ____ predeprivation hearing to satisfy procedural due process -- will be more closely related to the vindication of a constitutional right than terms that lay the groundwork for other remedial measures. We think that the structural terms in this case belong in the latter class. The Constitution itself is indifferent to whether DOC or DMH administers the Treatment Center. If, however, as King alleged, DOC personnel violated __ his constitutional rights in the process of usurping DMH's authority and interfering with his clinical treatment, then a decree keeping DOC within its statutory ambit begins to make sense in the context of a constitutional remedy. Although we, unlike the district court, would have eschewed the words "essential" and "critical," we think the structural terms were clearly, not just arguably, related to the constitutional remedy provided by the decrees. This is not to say that a change in the statutory scheme cannot be a significant change in law that warrants modification of the structural terms.5 In the context of  ____________________ 5. In Rufo itself, the Supreme Court remanded for ____ reconsideration under the standard it had just announced, even though "the agreed-upon decree . . . clearly was related to the conditions found to offend the Constitution." 502 U.S. at 389. -10- 10 King, the structural terms may have been a means to a ____ constitutional end; but it was possible to include them in the decree only because Massachusetts law already structured the Treatment Center in the same way. If existing state law had granted DOC exclusive jurisdiction over the Treatment Center, the parties could not have agreed to insert DMH into the administrative structure. Thus, a change in the very law underlying the structural terms is likely to be "significant" under Rufo, and may therefore require some modification of ____ the structural terms. This preliminary analysis is consistent with our own decisions before and after Rufo. In Rufo, the Supreme ____ ____ Court offered several examples of potentially significant changes in federal law. See id. at 388-90 ("one or more of ___ ___ the obligations placed upon the parties has become impermissible under federal law"; "the statutory or decisional law has changed to make legal what the decree was designed to prevent"; "a decision that clarifies the law" has undermined an agreement based on "a misunderstanding of the governing law"). Although none of the examples from Rufo is ____ on point here, our decision in Williams, which predated Rufo, ________ ____ suggests the proper test for significance in this case. If a subsequent state statute appears to overlap or conflict with a federal consent decree, "and the conflict . . . is less than clear, delicate questions of federalism must enter into -11- 11 our inquiry." See id., 822 F.2d at 1228 (citing Rizzo v. ___ ___ _____ Goode, 423 U.S. 362, 379 (1976) (federalism must be _____ considered in determining scope of equitable relief)). The district court should conduct a "careful case-specific inquiry" into both the decree and the statute "to discover whether their objectives and provisions necessarily conflict and to consider the importance of the areas of conflict to the overall goals of the litigation." Id. ___ We think that the nuanced, case-specific approach of Williams is consistent with the strictures of Rufo and ________ ____ with the equitable nature of relief from a decree under Rule 60(b)(5). See Rufo, 502 U.S. at 383 (noting that Rule ___ ____ 60(b)(5) permits relief from a court order when "'it is no longer equitable that the judgment should have prospective application'"). See also Mackin, 969 F.2d at 1278 ("the ___ ____ ______ decision as to whether to modify or dissolve [a structural decree] is at bottom an exercise of equitable power" that calls for a "deferential standard of review"). Chapter 489 reflects Massachusetts' legislative judgment that one agency rather than two can best perform the conflicting functions of the Treatment Center, i.e., maintain ____ security as well as provide treatment. As the district court noted, no one regards dual administration of the Treatment Center as workable. But why give DOC the run of the place? ___ The legislature apparently accepted the professional opinion -12- 12 that behavior modification or control, rather than traditional mental health treatment, is the most effective way to protect society from sexually dangerous persons and such persons from themselves. The correctness of this view is not before us; what matters is whether the goals of ch. 489 necessarily conflict with the rights enforced by the federal consent decree, and the importance of any such conflict to the overall goals of the litigation. Williams, ________ 822 F.2d at 1228. The extent and importance of the conflict can be exaggerated or trivialized, as the parties have tried to do. We think that the conflict is real but not so fundamental that ch. 489 necessarily thwarts the overall goals of the King litigation. King's primary goal was to ensure that his ____ treatment complied with the Constitution. The structural terms of the decree may serve that goal by keeping DOC, allegedly the offending actor, out of DMH's province; but as we have explained, those terms would have been inconceivable without the underlying state law. After all, plaintiffs cannot claim that DOC control per se violates the ___ __ Constitution. With the amendment of ch. 123A, the governing state law no longer gives DMH any role to play. In light of these federalism concerns, we think there has certainly been a "significant change . . . in law" within the meaning of Rufo, and that the plaintiffs cannot enforce the structural ____ -13- 13 terms of the decree in perpetuity. See Pearson III, 990 F.2d ___ ___________ at 658. In holding that the defendants had not shown a significant change in law, the district court apparently relied upon our decision in Coalition of Black Leadership v. _____________________________ Cianci, 570 F.2d 12 (1st Cir. 1978). The consent decree in ______ Cianci established a procedure whereby residents of ______ Providence, Rhode Island, could file complaints against their police officers for alleged civil rights violations. The Rhode Island legislature subsequently enacted a "Law Enforcement Officers' Bill of Rights" which conflicted in part with the decree. There was an "obvious subject matter overlap between the decree and the legislation," which served "dual and partially inconsistent purposes." Id. at 14. The ___ City of Providence moved to vacate the decree, and the district court denied the motion. We affirmed, noting that the court had "ordered both parties to work out modifications ______________________________________________ in the decree so that the protection of policemen's rights ______________ mandated by state law and the right of plaintiffs to be free from 'racially discriminatory police conduct' could[,] to the extent possible, both be achieved." Id. at 13 (emphasis ___ added). Moreover, we emphasized the district court's statement that the Court is inclined to look with deference upon the alternate procedural means embodied in the 1976 Act . . . . If the Rhode Island legislature has -14- 14 determined that the rights of police officers are in need of protection and that this protection can best be achieved by adoption of certain procedural protections, the Court is not prepared to question this judgment or to stand in the way of its implementation in the absence of any showing that the 1976 Act will hamper the effective presentation of civilian complaints which the consent decree has apparently accomplished. Id. at 14 n.1. We approved the district court's flexible ___ approach for resolving the conflict between the decree and the Act, even though the decree in Cianci, unlike that in ______ King, did not incorporate an administrative structure based ____ on superseded state law. Cf. Williams, 822 F.2d at 1234 n.5 ___ ________ (on remand, "[a]s in Cianci . . . the court should be ______ flexible in framing a response to the motion to avoid any conflict with the state statute when unnecessary for the goals underlying this litigation"). If anything, this case presents the stronger argument for modification, given the source of the structural terms, their relationship to the constitutional remedy, and the legislature's autonomy to restructure the governmental institutions of the Commonwealth. IV. IV. ___ Having found a significant change in law, we now "focus . . . on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." Rufo, 502 U.S. at 391. "Of course, a ____ -15- 15 modification must not create or perpetuate a constitutional violation." Id. at 391. ___ The district court evidently feared that the proposed modification would produce a de facto increase in __ _____ constitutional violations at the Treatment Center, even if there is nothing unconstitutional de jure about DOC's __ ____ assuming plenary authority. Based on its assessment of the history of this litigation, the court concluded "at this time" that DOC's control of the Treatment Center would compromise the federal constitutional remedies imposed by the consent decree, and the federal constitutional rights that the decree sought to protect. Critically, the defendants had not shown "what the Department of Correction . . . proposed to do" to "provide th[e] same treatment" as DMH under the remainder of the decree. Had the defendants made such a showing, "then perhaps [the district court] would be able to rule otherwise." This leaves us unsure of the district court's reason(s) for denying the proposed modification. Earlier in the hearing, the court had ruled that ch. 489 is not a significant change in law. Perhaps it was now saying that ch. 489 might be a significant change in law that warrants _____ modification of the consent decree, but the defendants had not yet demonstrated as a practical matter that the _________________________ modification would be implemented without producing or -16- 16 exacerbating constitutional violations at the Treatment Center. In fact, the defendants submitted no testimonial or documentary evidence of DOC's transfer plans; nor did they request an evidentiary hearing. On the sparse record before the district court, in light of the court's inconsistent observations, we cannot say whether the court properly denied modification for lack of suitable tailoring. See Rufo, 502 ___ ____ U.S. at 383. The prudent course is to remand for a new hearing. On remand, the district court may inquire into DOC's transfer plans. We note, however, that "once a court has determined that a modification is warranted, . . . principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials who must implement any modification." Id. at 392 n.14. "[T]he public interest and considerations ___ based on the allocation of powers within our federal system . . . require that the district court defer to local government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." Id. at 392 (quoting ___ Brown v. Board of Educ., 349 U.S. 294, 299 (1955)) (other _____ _______________ citations and quotation marks omitted). The district court -17- 17 should rely primarily on its jurisdictional oversight to ensure DOC's compliance with the decrees. Remanded. Remanded ________ -18- 18