127 F.3d 190
 Mitchell G. KING, et al., Plaintiffs, Appellees,
v.
Milton GREENBLATT, M.D., Commission of the Department of
Mental Health for the Commonwealth of
Massachusetts, et al., Defendants, Appellees.
Class of 48 + 1 and Donald Pearson, et al., Plaintiffs, Appellants.
Harold G. WILLIAMS, M.D., Commission of the Department of
Mental Health for the Commonwealth of
Massachusetts, et al., Plaintiffs, Appellees,
v.
Michael LESIAK, et al., Defendants, Appellees.
Norman Knight, Plaintiff, Appellant.
Harold G. WILLIAMS, et al., Plaintiffs, Appellees,
v.
Michael LESIAK, et al., Defendants, Appellees.
Sherman Miller, Patton Flannery, David M. Martel, Edward
Nadeau, Michael Woodward, Edward Gallagher, James
LeBlanc and Philip Pizzo, Appellants.
Mitchell G. KING, et al., Plaintiffs, Appellees,
v.
Milton GREENBLATT, M.D., Commission of the Department of
Mental Health for the Commonwealth of
Massachusetts, et al., Defendants, Appellees.
Class of 48 + 1 and Donald Pearson, et al. and Sherman
Miller, et al., Plaintiffs, Appellants.
Harold G. WILLIAMS, et al., Plaintiffs, Appellees,
v.
Michael LESIAK, et al., Defendants, Appellees.
Sherman Miller, David M. Martel, Edward Nadeau, Michael
Woodward, Edward Gallagher and James LeBlanc, Appellants.
 Nos. 95-1812, 97-1278, 95-1813, 96-1649, 97-1021 and 97-1057.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 8, 1997.
Decided Oct. 10, 1997.
 
 Anthony A. Scibelli, Boston, MA, with whom Robert D. Keefe, David R. Geiger, Jeffrey S. Follett, Charles Donelan, Boston, MA, and Jonathan I. Handler, Boston, MA, were on brief, for appellants Class of 48 + 1 and Donald Pearson and Sherman Miller, et al.
 Jeffrey S. Follett with whom David R. Geiger, Boston, MA, was on brief, for appellants Pearson, et al.
 Charles Donelan, Boston, MA, for appellants Sherman Miller, et al.
 William L. Pardee, Assistant Attorney General, Boston, MA, with whom Scott Harshbarger, Attorney General of Massachusetts, Boston, MA, Leo Sorokin, Assistant Attorney General, were on brief, for appellees.
 James R. Pingeon, Boston, MA, and Beth Eisenberg on brief, for the Center for Public Representation, amicus curiae.
 Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.
 COFFIN, Senior Circuit Judge.
 
 
 1
 This case arises out of consent decrees entered in two institutional reform litigations, King v. Greenblatt and Williams v. Lesiak, and implicates Supreme Court caselaw addressing the circumstances under which such decrees may be modified. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). In 1972 then civilly committed patients of the Massachusetts Treatment Center for Sexually Dangerous Persons ("Center") brought constitutional challenges to the conditions of confinement and the adequacy of treatment at the Center. After finding that conditions violated the Constitution, the district court in 1974 entered two consent decrees in King (the "Original King " decree and, one week later, the "Supplemental" decree) and one consent decree in Williams.[1]
 
 
 2
 In 1996, in the orders now on appeal, the district court modified all three decrees. It relied on our decision in King v. Greenblatt, 52 F.3d 1 (1st Cir.1995), where we found that Rufo's requirement of a significant change in fact or law was met as to five provisions of the Original King and Williams decrees by a new Massachusetts statute, 1993 Mass. Acts ch. 489, which transferred jurisdiction over those in plaintiffs' position from the Department of Mental Health ("DMH") to the Department of Corrections ("DOC"). We made no finding, however, as to the Supplemental decree.
 
 
 3
 In this appeal, appellants pursue a number of issues stemming from changes to the decrees. As to the Original King and Williams decrees, we are satisfied with the adequacy of the record to enable us to decide the appeal. As for the district court's rationale for modifying the Supplemental decree, however, it is our view that the change in law we identified does not, alone, justify modification of the Supplemental decree under Rufo. We therefore remand without further delay to the district court for a hearing and findings concerning whether a significant change in fact or law has occurred with respect to the specific issues covered by the Supplemental decree. We reserve jurisdiction over the appeal, and will consider all issues together after the district court submits its findings to us.
 
 I.
 
 4
 We begin by briefly sketching the legal backdrop for the appeal, and outlining the litigation history of the case. In section II we discuss why we believe the district court erred in approving modification of the Supplemental decree.
 
 
 5
 The principles that guide us were set out in Rufo, which established the standard for evaluating proposed modifications to a consent decree "that arguably relates to the vindication of a constitutional right." Rufo, 502 U.S. at 383 n. 7, 112 S.Ct. at 760 n. 7. Under Rufo, a party seeking modification of a consent decree has the burden of meeting two requirements. The party "may meet its initial burden by showing ... a significant change either in factual conditions or in law." Id. at 384, 112 S.Ct. at 760. "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance."[2] Id. Thus, the question of whether a modification is suitably tailored will not come into play unless the burden of demonstrating a significant change in factual conditions or law has been carried. Our analysis here concerns only whether the requisite initial showing of significant change in fact or law was made as to the Supplemental decree. This analysis requires a review of the case history directly relevant to the modification of the Supplemental decree.[3]
 
 
 6
 The first five provisions of the 1974 Original King and Williams consent decrees contained parallel language prohibiting the Department of Corrections from making treatment decisions at the Center, allowing DOC governance only as to custodial personnel, placing primary responsibility and authority in the Department of Mental Health, and emphasizing that patients should have the least restrictive conditions necessary to achieve the purposes of commitment. These provisions tracked the language of then Mass. Gen. Laws ch. 123A, § 2, which authorized DMH governance of patients and treatment at the Center.[4]
 
 
 7
 The Supplemental decree addressed King's specific complaints concerning use of isolation at the Center. In addition to requiring that sequestered patients be afforded minimum standards of due process and human decency, the Supplemental decree stated,
 
 
 8
 Defendants shall not use or permit the use of solitary confinement at the Treatment Center at Massachusetts Correctional Institute, Bridgewater, for the purpose of discipline or punishment, disciplinary and punitive procedures having no place in the care and treatment of civilly committed patients.[5]
 
 
 9
 In 1994 the Massachusetts state legislature amended chapter 123A with 1993 Mass. Acts ch. 489. Section 2 of chapter 489 provides, "[t]he commissioner of correction shall maintain subject to the jurisdiction of the department of correction a treatment program or branch thereof at a correctional institution for the care, custody, treatment and rehabilitation of persons [ad]judicated as being sexually dangerous." The law thus shifted jurisdiction from DMH to DOC.
 
 
 10
 Responding to the change in law, defendants sought to modify the Original King and Williams decrees, specifically the first five provisions of the decrees and a sixth provision setting forth a time schedule for DMH to implement requirements of the decrees. They argued that the passage of chapter 489 constituted "a significant change in circumstances warrant[ing] revision of the decree," in satisfaction of Rufo. Judge Mazzone denied the motion to modify, citing in part lack of information and recommending that DOC submit specific details and information concerning its proposed treatment plans.
 
 
 11
 The defendants appealed the denial to this court. While that appeal was pending, the defendants filed a renewed motion to modify, seeking the same modifications and, for the first time, modification of the Supplemental consent decree. They requested that the court replace the Supplemental decree's language "for the purpose of discipline or punishment, disciplinary and punitive procedures having no place in the care and treatment of civilly committed patients" with "for the purpose of punishing residents for the acts underlying their commitment." The proposed change thus barred punitive sequestration only for the conduct that triggered commitment, permitting its use for acts occurring during the patient's stay at the Center. As grounds for altering the Supplemental decree, defendants stated, "This modification will permit the implementation of a system of behavior management at the Treatment Center, and will further the goals of the cognitive treatment program by helping residents to take responsibility for their actions."
 
 
 12
 In support of their renewed motion to modify, defendants submitted a lengthy plan for administration and management of the Center ("Plan"). The Plan sets forth policies for management and staffing, clinical treatment, educational and vocational treatment, behavior management, resident management operations, community access, and integration of the Center with the prison's program for sex offenders.
 
 
 13
 About six months later, while the renewed motion to modify was pending before the district court, we issued our decision in King, 52 F.3d 1. We found that chapter 489 amounted to a significant change in law with respect to the first five provisions of the Original King and Williams decrees. Modification of those decrees therefore was permissible under Rufo. Id. at 5-6. However, because Rufo also requires that any "proposed modification be suitably tailored to the changed circumstance," we remanded to the district court for determination as to whether the proposed modifications were suitably tailored. Id. at 7 (citing Rufo, 502 U.S. at 391, 112 S.Ct. at 763-64).
 
 
 14
 On remand, the district court approved all of the requested modifications. After noting that our opinion resolved the question of whether the first prong of Rufo had been met, the district court focused its analysis on whether the modifications met Rufo 's second prong. Emphasizing the Plan's comprehensiveness and inclusion of provisions addressing potential problems, the court followed our directive to give significant weight to the views of the local government officials who would be implementing any modifications. See King v. Greenblatt, No. 72-7888, slip op. at 8-9 (D. Mass. June 25, 1995). Finding also that the proposed changes would not create or perpetuate constitutional violations, the district court concluded that the modifications were suitably tailored to the change in law, and retained, as we recommended, its "jurisdictional oversight" to ensure DOC's compliance with the decrees. Id.
 
 
 15
 Shortly thereafter, in response to plaintiffs' numerous objections to the modifications and their motion to stay implementation of the changes, the district court suspended five aspects of its order, including modification of the Supplemental decree, to allow further briefing and a hearing. King v. Greenblatt, No. 72-788, slip op. at 2-4 (D.Mass. July 31, 1995). Following the hearing, the district court issued an order lifting its stay. See King v. Greenblatt, No. 72-788, slip op. (D.Mass. Oct. 31, 1996). All modifications requested by defendants in their renewed motion to modify are now in effect.
 
 
 16
 Plaintiffs subsequently filed this appeal, raising numerous challenges to the modification of the decrees. We review the district court's application of Rufo de novo. See Inmates v. Rufo, 12 F.3d 286, 291 (1st Cir.1993). At this time, we choose to address only the district court's modification of the Supplemental decree, which appears to have resulted from its erroneous application of our decision in King. Believing that the court should have the opportunity to reconsider the proposed modification in light of the applicable principles, we remand the case for reconsideration based on our discussion in the following section. After the district court's ruling, and after receiving comments from the parties, we will review the remaining contentions concerning the modifications.
 
 II.
 
 17
 Our earlier decision in this case, finding a significant change in law with respect to the first five provisions of the Original King and Williams decrees, expressly stated that those were the only terms that the defendants sought to modify. See King, 52 F.3d at 2 n. 2, 4. Our remand, therefore, was limited to a consideration of those provisions, which directly concerned DMH and DOC control of the Center.
 
 
 18
 The district court, however, considered all of the proposals presented in defendants' renewed motion to modify, including the Supplemental decree. In the order lifting its stay of the modification, the court used the following standard to determine whether modification of the Supplemental decree was warranted: "Given that Chapter 489 has been found to be a significant change in law by the First Circuit, analysis of the Commonwealth's argument in favor of modification rightfully starts there. If the modification is unrelated to the change in law, then clearly an independent significant change in circumstances is necessary to justify modification." See King, No. 72-788, slip op. at 19 (Oct. 31, 1996) (citation omitted).
 
 
 19
 The district court then went on to conclude that the Supplemental decree fell under the change in law we had previously recognized because it was "sufficiently related" to that change. Id. In reaching that conclusion, the court placed great weight on our ruminations concerning the reasons behind the legislative decision to amend chapter 123A with chapter 489. It focused particularly on the following statement from our earlier opinion:
 
 
 20
 Chapter 489 reflects Massachusetts' legislative judgment that one agency rather than two can best perform the conflicting functions of the Treatment Center, i.e., maintain security as well as provide treatment. As the district court noted, no one regards dual administration of the Treatment Center as workable. But why give DOC the run of the place? The legislature apparently accepted the professional opinion that behavior modification or control, rather than traditional mental health treatment, is the most effective way to protect society from sexually dangerous persons and such persons from themselves. The correctness of this view is not before us; what matters is whether the goals of ch. 489 necessarily conflict with the rights enforced by the federal consent decree, and the importance of any such conflict to the overall goals of the litigation.
 
 
 21
 King, 52 F.3d at 5. The district court read this passage as evidence that we "clearly viewed the very purpose of the change in law as contemplating that DOC would implement its own policies and procedures." See King, No. 72-788, slip op. at 19 (Oct. 31, 1996). It thus concluded that "the proposed modifications [to the Supplemental decree] were sufficiently related to the change in law and may properly be reviewed for satisfaction of the second prong of Rufo." Id. at 19-20.
 
 
 22
 We agree with the district court's threshold analysis that an independent significant change, defined by Rufo as a change in factual circumstances or in law, is required to justify modification. We disagree, however, with the court's application of this standard.
 
 
 23
 Our earlier decision that enactment of chapter 489, which shifted management of the Center, constituted a significant change in law with respect to the first five provisions of the Original King and Williams decrees was inescapable since each of those provisions concerns administration of the facilities. In our view, however, new management of the facility does not inevitably require a change in the way solitary confinement is used, and chapter 489 therefore does not, at least without further explanation, constitute a significant change in law with respect to the Supplemental decree, which concerns only issues of sequestration.
 
 
 24
 The district court apparently believed there was enough of a connection between chapter 489 and sequestration, relying in large part on our language speculating about the legislature's motivations. Yet our theory as to why the legislature amended chapter 123A cannot, standing alone, form the basis for a finding of change in fact or law. The party seeking to modify a consent decree carries the burden of showing a specific significant change in the underlying factual circumstances or the legal principles integral to the original order. Our speculation as to a philosophical shift in mental health care does not by itself satisfy this burden; while clearly not a change in law, it also does not meet the required showing for a change in fact. "The sort of factual changes that may qualify include unanticipated developments that render continuation of the decree 'inequitable,' or that, 'for reasons unrelated to past discrimination or the fault of the parties,' make it extremely difficult or impossible to satisfy obligations that, while imposed by the decree, are not part of its fundamental purpose." Ensley Branch, NAACP v. Seibels, 31 F.3d 1548, 1562-63 (11th Cir.1994) (citations omitted). A party relying on a philosophical shift to justify changes in a consent decree must spell out the fair implications of the shift and must demonstrate that continued adherence to the decree will be inequitable, unfair or untenable.
 
 
 25
 While there may be some circumstances in which discrete practices within an institution will be so intimately and inherently related to changes in administration that modification would be warranted, in this case the link between the shift in management of the Center and use of sequestration as punishment is too tenuous, at least without further development. The record demonstrates no reason why the principles underlying the Supplemental decree--that sequestration not be used to punish patients--could not be implemented in a facility where ultimate authority rests with DOC. Simply because punishment is a primary element of typical correctional programs does not necessarily mean that it need be the basis for programs designed for civilly committed sexual abusers. The district court's approach would result in modification of any substantive treatment or procedure in effect under DMH and to which DOC now objects, without an inquiry into whether the particular provisions for which modification is sought are themselves directly impacted by the change in law.
 
 
 26
 Because Rufo applies only when constitutional rights are involved, courts must give punctilious regard to its two-part hurdle, carefully and thoroughly analyzing whether the requisite change has occurred and whether the proposed modifications are suitably tailored to that change. So that the district court may undertake such an analysis with respect to the Supplemental consent decree, we vacate its order modifying the decree and remand this portion of the appeal to that court for further findings. We expect that the court will schedule a hearing for presentation of views on this issue and request written submissions from the parties. We leave it to the court to decide whether any further factual or opinion evidence is necessary. We invite the parties to request the clerk of this court to set a schedule for supplemental briefing to us once the district court has made its finding. We reserve the other issues on appeal until such time as we have all issues before us.
 
 
 27
 The order modifying the Supplemental decree is vacated, and the case is remanded for a hearing and findings in accordance with this opinion. In the interim, we retain appellate jurisdiction.
 
 
 
 [1]
 It also entered a Partial consent decree in 1975. This decree arose from issues raised in Williams, but is distinct from the 1974 decree entered in Williams and to which we now refer as the Williams decree. No aspect of the Partial consent decree is explicitly at issue here
 
 
 [2]
 For modifications to meet the suitably tailored requirement, they must not create or perpetuate a constitutional violation and should address and accommodate difficulties created by the changed circumstances. See Rufo, 502 U.S. at 391, 112 S.Ct. at 764 (emphasizing that "[a] court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires"). Where these conditions are met, the court should give deference to the local government officials who will be responsible for resolving difficulties and carrying out the provisions of institutional reform. Id
 
 
 [3]
 In the course of addressing numerous suits seeking to enforce or modify the decrees, we have abundantly reviewed the lengthy history of litigation in this case. See In re Pearson, 990 F.2d 653 (1st Cir.1993); Pearson v. Fair, 935 F.2d 401 (1st. Cir.1991); Langton v. Johnston, 928 F.2d 1206 (1st Cir.1991); Williams v. Lesiak, 822 F.2d 1223 (1st Cir.1987); Pearson v. Fair, 808 F.2d 163 (1st Cir.1986). Accordingly, we present here only a limited description of the complex litigation history
 
 
 [4]
 Chapter 123A, entitled "Care, Treatment and Rehabilitation of Sexually Dangerous Persons," provided in section 2, in relevant part:
 The commissioner of mental health shall establish and maintain, subject to the jurisdiction of the department of mental health, a treatment center ... at a correctional institution approved by the commissioner of correction, for the care, custody, treatment and rehabilitation of [sexually dangerous] persons.... The commissioner of correction shall appoint such custodial personnel as may be required for such center. Such custodial personnel shall be subject to the control of the commissioner of mental health with respect to the care, treatment and rehabilitation of persons in their custody, but shall at all times be under the administrative, operational and disciplinary control of the commissioner of correction. The commissioner of mental health shall appoint to such center, in addition to the personnel appointed by the commissioner of correction, adequate personnel for the care, treatment and rehabilitation of such persons committed to their care.
 
 
 [5]
 In 1981 six Center patients, known as Pearson et al., sought enforcement of the consent decrees with respect to sequestration only. After a series of motions and orders, in 1988 United States District Judge Young issued injunctions "to provide a more precise order ... to protect the rights of all parties and to implement the thrust of the earlier consent decree and supplementary consent decree." See Pearson v. Fair, No. 81-3219, slip op. (D.Mass. Nov. 21, 1988). Among these injunctions were requirements that isolation could be used only in emergency situations (defined as when the patient attempts or does serious harm to himself and others, where the patient seriously disrupts the therapeutic environment, or where the patient's conduct presents a serious and imminent threat of the above), and that clinicians review sequestration decisions. Id. In 1989, after reviewing the injunctions, Judge Mazzone stayed any order vacating them until a comprehensive review of their need took place. See Pearson v. Fair, No. 81-3219, slip op. at 169 (D.Mass. Aug. 28, 1989). The injunctions remained in effect until Judge Mazzone's 1996 order lifting the stay. See King v. Greenblatt, No. 72-788, slip op. at 32 (D.Mass. Oct. 31, 1996)