USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

Nos. 95-1812
 97-1278

 MITCHELL G. KING, ET AL.,

 Plaintiffs, Appellees,

 v.

 MILTON GREENBLATT, M.D.,
 COMMISSION OF THE DEPARTMENT OF MENTAL HEALTH FOR THE
 COMMONWEALTH OF MASSACHUSETTS, ET AL.,

 Defendants, Appellees.

 ____________________

 CLASS OF 48 + 1 AND DONALD PEARSON, ET AL.,

 Plaintiffs, Appellants.
 ____________________

No. 95-1813

 HAROLD G. WILLIAMS, M.D.,
 COMMISSION OF THE DEPARTMENT OF MENTAL HEALTH FOR THE
 COMMONWEALTH OF MASSACHUSETTS, ET AL.

 Plaintiffs, Appellees,

 v.

 MICHAEL LESIAK, ET AL.,

 Defendants, Appellees.
 ____________________

 NORMAN KNIGHT,

 Plaintiff, Appellant.
 ____________________

No. 96-1649

 HAROLD G. WILLIAMS, ET AL.,

 Plaintiffs, Appellees,

 v.

 MICHAEL LESIAK, ET AL.,

 Defendants, Appellees.
 ____________________

 SHERMAN MILLER, PATTON FLANNERY, DAVID M. MARTEL,
 EDWARD NADEAU, MICHAEL WOODWARD, EDWARD GALLAGHER,
 JAMES LEBLANC AND PHILIP PIZZO,

 Appellants.
 ____________________

No. 97-1021

 MITCHELL G. KING, ET AL.,

 Plaintiffs, Appellees,

 v.

 MILTON GREENBLATT, M.D.,
 COMMISSION OF THE DEPARTMENT OF MENTAL HEALTH FOR THE
 COMMONWEALTH OF MASSACHUSETTS, ET AL.,

 Defendants, Appellees.

 ____________________

 CLASS OF 48 + 1 AND DONALD PEARSON, ET AL.
 AND SHERMAN MILLER, ET AL.,

 Plaintiffs, Appellants.
 ____________________

No. 97-1057

 HAROLD G. WILLIAMS, ET AL.,

 Plaintiffs, Appellees,

 v.

 MICHAEL LESIAK, ET AL.,

 Defendants, Appellees.
 ____________________

 SHERMAN MILLER, DAVID M. MARTEL, EDWARD NADEAU, 
 MICHAEL WOODWARD, EDWARD GALLAGHER AND
 JAMES LEBLANC.

 Appellants.
 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. A. David Mazzone, Senior U.S. District Judge]

 ____________________

 Before

 Selya, Circuit Judge,
 Coffin and Campbell, Senior Circuit Judges.

 ____________________

 Anthony A. Scibelli with whom Robert D. Keefe, David R. Geiger,
Jeffrey S. Follett, Charles Donelan, and Jonathan I. Handler were
on brief for appellants Class of 48 + 1 and Donald Pearson and
Sherman Miller, et al.
 Jeffrey S. Follett with whom David R. Geiger was on brief for
appellants Pearson, et al.
 Charles Donelan for appellants Sherman Miller, et al.
 William L. Pardee, Assistant Attorney General, with whom Scott
Harshbarger, Attorney General of Massachusetts, and Leo Sorokin,
Assistant Attorney General, were on brief for appellees.
 James R. Pingeon and Beth Eisenberg on brief for the Center for
Public Representation, amicus curiae.

 ____________________

 July 7, 1998
 ____________________ COFFIN, Senior Circuit Judge. This opinion is a continuation
of King v. Greenblatt ("King II"), 127 F.3d 190 (1st Cir. 1997),
which is the latest judicial discussion in a group of cases dating
back to 1972, concerning a resident population of civilly committed
sexually dangerous persons in the Treatment Center at the
Massachusetts Correctional Institute in Bridgewater, Massachusetts
(Center). A reference to prior cases is contained in the opinion
just cited. Our present review concerns the proposed
modifications, granted by the district court, of two longstanding
consent decrees, the Original Decree and the Supplemental Decree. 
 The Original Decree had provided that the Center would be
treated as a facility of the Department of Mental Health (DMH),
with primary authority to be exercised by DMH and custodial 
personnel to be controlled by the Department of Correction (DOC). 
Patients were to have "the least restrictive conditions necessary
to achieve the purpose of commitment." Both DMH and DOC were to
"take steps jointly" to improve physical conditions, carry out a
meaningful work program, and have "a system of differing security
for different categories of patients" to permit less restrictive
conditions for those patients not requiring maximum security. 
 In an earlier opinion we considered challenges to proposed
modifications of that decree. See King v. Greenblatt ("King I"),
52 F.3d 1 (1st Cir. 1995). We addressed the significance of the
recently enacted 1993 Mass Acts. ch. 489, which gave DOC exclusive
jurisdiction of the care, treatment, rehabilitation and an added
statutory goal custody of civilly committed sexually dangerous
persons in the Center. We held that this statute met the first
prong of Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384
(1992) (i.e., it was a significant change of law impacting an
existing consent decree, warranting modification of such decree),
but remanded the case to the district court to consider whether the
proposed modifications met the second Rufo prong, id. (i.e.,
whether the modifications were "suitably tailored" to the new law). 
See King I, 52 F.3d at 7.
 Upon remand, the district court found that the proposed
modifications to the Original Degree were "suitably tailored" to the
new law; the court also determined that the proposed modifications
to the Supplemental Decree met both prongs of Rufo as they were
"sufficiently related" to the change in state law and "suitably
tailored." The case was then appealed to us. We remanded it to
the district court to address only issues relevant to the
Supplemental Decree, and reserved our "suitable tailoring" review
and all other issues relating to the Original Decree.
 We recognized that the proposed modifications in the
Supplemental Decree went beyond a transfer of exclusive authority
to DOC and would effect substantive changes in disciplinary
policies, allowing the imposition of sequestration for punishment
purposes (except for acts underlying commitment) and deleting a ban
on all discipline and punitive procedures in the treatment of
inmates civilly committed. See King II, 127 F.3d at 195. We
opined that the link between a change in administration and
sequestration policy was too tenuous, at least without further
development. Id. We also held that neither Chapter 489, "at least
without further explanation," nor our speculation, standing alone,
that the Massachusetts legislature had apparently accepted a
preference for behavior modification over mental health treatment
would constitute a "significant change in law" affecting
sequestration policy. Id.
 We therefore sent back the proposed modifications of the 
Supplemental Decree to the district court for further
consideration, leaving it to the court to decide whether additional 
factual or opinion evidence was needed. The court has since
complied with our directive and, after hearing and submissions, has
determined both that the change in control managed by Chapter 489
is a significant change in the law affecting the Supplemental
Decree and that the modifications were suitably tailored. We now
address this determination and all outstanding issues relating to
both decrees.
 This litigation, now in its twenty-seventh year, involving
half a dozen district judges, magistrate judges, and many
conferences, hearings briefings, and appeals, has accomplished much
in a troubled and complex field of custody and treatment of
institutionalized sexually dangerous persons. During this period,
changes have occurred in conditions of confinement and treatment,
in the problems confronted, and in the institutional setting. 
After exhaustive briefings and argument from capable counsel, we
conclude that the district court acted sensitively and
appropriately in conducting the proceedings below, upholding the
proposed modifications of both the Original Decree and the
Supplemental Decree, and signaling its readiness to exercise its
oversight when occasion warrants. While we cannot expect "closure"
of tensions and problems, we may hope for problems of smaller
dimension capable of systematic resolution without the necessity of
heroic effort.
 We first address several issues relating to the Original
Decree.
 I. The Original Decree.
A. Denial of Discovery and Evidentiary Hearing.
 Plaintiffs repeatedly requested the opportunity to engage in
discovery and an evidentiary hearing. They sought to discern
whether DOC intended to provide "meaningful treatment under the
Plan" and whether its treatment plan was consistent with the "least
restrictive conditions" requirement of the Original Decree. 
Plaintiffs proposed accomplishing this by exploring DOC's past
behavior, present behavior, and expressions of future intent. 
Plaintiffs' proposal contemplates interviews with all residents,
examination of new procedures, expert testimony interpreting the
Plan, investigation of current practices, inquiry into internal
memos relating to the Plan and the persons instrumental in
formulating it, and depositions of DOC officials and Joint Resource
Institute (JRI) personnel responsible for treatment. As much as
six months of time would be needed.
 The basic response of the court in denying discovery requests
was:
 It may be that the plan won't work, but the Court of
 Appeals . . . [told me not to] prejudge the plan, but
 they told me . . . I should have a hearing, inquire into
 the DOC plan, giving significant weight to the local
 government.
 * * *
 . . . [W]hat would DOC do under this plan? And then I
 should use my judicial oversight, primarily rely on my
 judicial oversight, to insure that the DOC is complying
 with the decrees. So it seems to me that that's a very
 clear blueprint.

 This was an accurate precis of our directives "to give
significant weight to the views of local government officials" and
to "rely primarily on its jurisdictional oversight to ensure DOC's
compliance with the decrees." King I, 52 F.3d at 7. Moreover,
even absent these directives, a trial court is vested with broad
discretion in granting or denying discovery. 8 Charles A. Wright
et al., Federal Practice and Procedure 2006, at 91 (1994). 
 The task of the district court, following our directives, was
to determine whether DOC, which had been given authority under
state law, was likely to manage the Center without doing violence
to the substantive portions of the Original Decree. In the words
of the Special Master appointed by the court, the inquiry being
undertaken was "whether DOC is approaching the control of the
institution with a treatment modality."
 In support of its proposal for extensive discovery and
hearing, plaintiffs relied principally on the extensive procedure
which the trial judge adopted on remand in Inmates of the Suffolk
County Jail v. Rufo, 844 F. Supp. 31 (D. Mass. 1994). But it does
not follow from the fact that a judge allowed discovery and
evidentiary hearing in one case that a denial of discovery in a
different case is an abuse of discretion.
 Appellants' basic interest in discovery was to elicit views
and evidence of DOC's sincerity. To test the viability of this
goal in the particular posture in which the district court found
itself, we venture the following scenario. Assume that a number of
witnesses testified in deposition or at a hearing that DOC
officials were insincere and had no intention of carrying out the
Plan as written. If the court found the witnesses credible, would
it then deny DOC's request to modify? The consequence would be
that the Center would then revert to the earlier dual management,
despite the passage of Chapter 489. Or, would the court craft, as
amicus argued, its own solution, substituting the Clinical Director
for DOC, creating the bizarre situation of an employee of an entity
under contract with DOC holding powers denied to DOC? In either
case DOC would have no future opportunity to demonstrate its
fitness to manage.
 It seems clear to us that had the court pursued either course,
it would not have accorded "significant weight to the views of
local government officials." Indeed, it would have rejected them
in their entirety on the ground of insincerity. This would violate
not only our guidance but that of the Supreme Court in Rufo, 502
U.S. at 392 n.14. It would also violate our directive to rely
primarily on continuing oversight.
 We think it therefore reasonable, at the proposed
modifications stage, that the district court declined to allow an
extensive investigation as to whether DOC was acting in good faith. 
We are not saying that the court would have abused its discretion
had it chosen to allow some kind of discovery and evidentiary
hearing, but certainly it did not abuse its broad discretion in
denying such.
B. Delayed Appointment of Counsel.
 Among the interests represented in the cluster of lawsuits now
collected under the King v. Greenblatt tent are those raised in
Williams v. Lesiak, 822 F.2d 1223 (1st Cir. 1987). In that case,
the plaintiffs had focused on treatment issues at the Center,
particularly the absence or inferior quality of work, job training,
and educational programs. On May 27, 1994, the district court
reopened Williams and consolidated it with King. Although the
remaining Williams plaintiffs requested counsel on a number of
occasions, counsel was not appointed for them until August 17,
1995. This delay, they contend, constituted an abuse of discretion
and is reason for reversal.
 Here again the review threshold is high. This being a civil
case, there is no constitutional right to counsel and the statutory
authority, 28 U.S.C. 1915, is discretionary. See Cookish v.
Cunningham, 787 F.2d 1, 2 (1st Cir. 1986). Moreover, we may find
reversible error only if "exceptional circumstances were present
such that a denial of counsel was likely to result in fundamental
unfairness impinging on [plaintiffs'] due process rights." 
DesRosiers v. Moran, 949 F.2d 15, 23 (1st Cir. 1991).
 Our review of the evaluation of this complex and multi-faceted
litigation during the fifteen months of delay reveals court actions
which manifested a sensitivity to the interests of Williamsplaintiffs and a total absence of recognizable unfairness. The
first stage during this period began on May 27, 1994, with the
reopening of Williams and the court's denial of the Commonwealth's
motion to modify the Original Decree. At this time the court,
having recently appointed counsel for a different group of patients
intervening in King, the "Class of 48 + 1," expressed the hope that
such counsel would "look at the global picture." The court also
indicated that it might look for another person who would represent
only the Williams plaintiffs. In December 1994, appointed counsel
for the "Class of 48 + 1" plaintiffs informed a Williams party that
he was not representing his interests. From this time, therefore,
until August 17, 1995, the Williams plaintiffs knew they were
unrepresented.
 Any lack of representation during this period, however, was
without any practical effect. As the district court denied the
Commonwealth's motion to modify at the hearing on May 27, 1994, the
Williams plaintiffs suffered no disadvantage at that time. We did
not issue an opinion on the Commonwealth's appeal of that denial
until April 6, 1995. The appeal concentrated on the significance
of the enactment of Chapter 489, and did not raise any Williamsissue. Our opinion, after holding that the statute had indeed
constituted a significant change of law, meeting Rufo's first
prong, simply remanded the case to the district court to consider
whether the second Rufo prong had been met. Again, there was no
opportunity for harm to the Williams plaintiffs' interests in the
appeal. In the interim period between the denial of the motion to
modify and our decision on the appeal, DOC submitted its Management
Plan for the Administration of the Treatment Center (Plan), views
were exchanged between a Special Master and DOC, and settlement
discussions took place. These discussions generally resulted in an
impasse. Moreover, during much of this time, the interests of all
residents were identical, since the original motion to modify
sought only a change in administrative control. 
 In May 1995, the court denied discovery, see supra, resolving
to confine its efforts to a close scrutiny of the Plan itself. 
Thus, neither side was allowed to investigate or receive additional
documentation on or deposition of the other. And although on
November 11, 1994, the Commonwealth filed a renewed motion to
modify, seeking a change in the Supplemental Decree, no action was
taken by the district court until June 29, 1995. At that time, the
district court granted the renewed motion, but it also stayed four
important parts of the Plan, including the Community Access Plan
(CAP), involving issues prominent in Williams. Six weeks later, on
August 17, 1995 before any action was taken on the stayed
provisions of the Plan, or on any other area concerning which the
Williams plaintiffs had expressed concern counsel was appointed. 
 On this record, not only have counsel been unable to point to
any prejudice stemming from the delay in appointing counsel for the 
Williams plaintiffs, but we see no possibility, as the case
progressed through its various stages, of any prejudice or 
"fundamental unfairness." We are satisfied that their interests
were adequately protected by the appointment of counsel in August
1995.
C. "Suitable Tailoring" of Modifications.
 The second prong of Rufo requires that a consent decree be
changed no more than necessary to resolve the problems created by
the change of circumstances. The proposed modifications must not
defeat the core purpose of the consent decree nor, of course,
create a constitutional violation. See Rufo, 502 U.S. at 391-92.
 Superficially, one might say that the changed circumstance is
simply the vesting of all authority over the Center in DOC and that
the proposed modifications for the Original Decree merely parrot
Chapter 489 by substituting DOC for joint mention of DOC and DMH. 
Such a literal approach, however, obscures the reality that the
Massachusetts legislature, in vesting unitary control in DOC, was
also recognizing that DOC's views of the policies best suited to
balance the two objectives of the Center effective treatment of
the sexually dangerous persons and the security and safety of the
patient/inmate and the population as a whole differed from those
which had guided DMH during much of the previous quarter of a
century. Legislative emphasis on the goal of security and safety
is evidenced by the addition of "custody" in the Chapter 489
amendment to the previous formulation of goals in Mass. Gen. Laws.
ch. 123A 2 of "care, treatment and rehabilitation." Accordingly,
the change in control contemplated change in operations and
embraced the grant of some degree of flexibility and initiative to
DOC.
 Similarly, the proposed modifications cannot be limited to the
simple change in authority, since, as we have just noted, that
change is inevitably overlaid with some expectation of change in
some policies and practices. This does not mean that DOC has carte
blanche to do anything it wishes, for the Original Decree remains
unmodified in its requirement that "patients at the Treatment
Center should have the least restrictive conditions necessary to
achieve the purposes of commitment." 
 This provision is the substantive essence of the Original
Decree. The decree does not embrace all the policies and practices
that have been relied on in the past by DMH to achieve effective
treatment under the least restrictive conditions. By the same
token, as the district court realized, the "proposed modifications"
are not the host of provisions in the 138-page Plan, which simply
sets forth ways in which DOC aspires to fulfill the requirements of
the Original Decree.
 The task of conducting a "suitable tailoring" analysis
therefore requires trying to determine if the basic thrust of the
new authority is likely to violate "least restrictive conditions"
or constitutional requirements. While the Commonwealth has the
burden to demonstrate "suitable tailoring," we have also instructed
the district court, as we have noted, to give significant weight to
the views of local officials and to rely "primarily" on continuing
judicial oversight to rectify violations. King I, 52 F.3d at 7. 
Accordingly, unless a demonstrably inadequate or erroneous policy
undercutting the Original Decree appears from an anticipatory
scrutiny of the Plan, DOC should be allowed to proceed.
 The district court had before it not only the Plan but two
volumes of appendices, exhibits, and affidavits, comments from the
plaintiffs and the Special Master, and responses by DOC. The Plan
has seven sections: (1) management and staffing; (2) clinical
treatment program; (3) educational and vocational treatment; (4)
behavior management; (5) resident management and operations; (6)
CAP; and (7) integration of the Center with the prison program for
sex offenders. The district court reviewed in some detail behavior
management provisions (specifically, the Behavior Review Committee,
the Minimum Privilege Unit, and Transfer Board policies), CAP, and
resident management and operations (specifically, the restriction
of privileges).
 The court found that the Plan was "a permissible and detailed
proposal" addressing both the increased emphasis on security and
treatment concerns. With respect to security, the court stated,
"security concerns in the Treatment Center have always been viewed
as legitimate." As to treatment, the court took note of the fact
that treatment was to be provided by JRI, which had been under
contract with DMH since 1992, and that its employee, Dr. Barbara
Schwartz, the Center's Treatment Director, affirmed that DOC would
retain the clinical, educational, vocational and rehabilitation
programs initiated by JRI. It therefore approved the proposed
modifications, concluding that the Plan "appears to properly
balance the competing goals of treatment and security and
adequately protects the rights of the residents." 
 The court refused, however, to vacate the Decrees, as the
Commonwealth requested, stating:
 While the Plan details the provision of treatment and the
 ability of DOC to address security concerns, at bottom,
 the potential for conflict between these interests
 continues to exist. The confusing and conflicting roles
 of DMH and DOC have been resolved. It is DOC's sole
 responsibility to provide treatment in a secure setting. 
 The Plan provides them with the rules to accomplish this. 
 The Plan does not, and no plan can, provide the
 willingness and commitment in doing so.

Thus recognizing that only future performance would administer the
Plan in harmony with the essence of the Decrees, the court denied
the motion to vacate without prejudice to review it for one year;
following that period, during which the court would monitor Plan
implementation, it would reconsider the motion.
 On appeal, appellants first level the general charge that DOC
"has essentially turned the Treatment Center into a prison and
fundamentally altered the therapeutic community." It is, of
course, true that the added emphasis on security and safety,
together with a new approach to behavior management, featuring
definite sanctions for defined unacceptable behavior, will
inevitably effect some retreat from a more permissive atmosphere. 
But appellants' sweeping condemnation cannot stand without more
precise identification of serious defects in the many provisions
regarding varieties of treatment, the extent of clinical
supervision, and the safeguards of individual rights.
 Appellants turn specifically to four areas. The first is CAP,
where the participants have shrunk from fifty-six in 1988 to two in
1997. They also criticize the application process that must be
completed by an patient/inmate before being accepted for release
into the community. Under the Plan, the patient/inmate must
initiate his own program proposal, then must face review with the
prospect that, if once denied acceptance, he must begin again after
a six month delay. Appellants also say that the Community Access
Board should, under Youngberg v. Romeo, 457 U.S. 307 (1982), be
entirely composed of clinicians.
 The Plan devotes some forty-four pages to CAP. This has
obviously been a subject of intense rethinking. Under a change in
the statute, a resident is no longer eligible for participation if
he is still serving a sentence; he must now have completed serving
any criminal sentence. The introductory section observes that the
prior policies did not adequately emphasize public safety and
states, "Recent events and improvements in the understanding of
both the dynamics of sexual offenses and the realistic objectives
for treatment, as well as legislative change to Chapter 123A, have
lead [sic] to the development of a revised program." The Plan
adopts a cautious approach which recognizes that "sexually
dangerous persons" will "never cease to be 'at risk.'"
 Accordingly, whereas access to the community had earlier been
approved prior to the designing of a program, careful, even
meticulous, planning must now precede approval of access. The
process of plan review and approval is indeed a daunting,
attenuated one. But we cannot at this juncture rule the new
program out of bounds. In this most sensitive area of tension
between safety and treatment, and between the individual and the
community, we cannot say that CAP is not the least restrictive
feasible response.
 The shrinkage in numbers of participants must be viewed
against the background that a substantial number of residents, many
of whom are serving very lengthy sentences, simply refuse to
participate in or apply to treatment programs. Moreover, a JRI
analysis reveals that in 1996, three of the ninety-one eligible
residents of a total population of 202 submitted applications and
proposed plans. As of January 1997, two remained in the program
while twelve resided in the less restrictive Community Transition
House in a "pre-transition" program. This does not, in our opinion,
point to any obvious constitutional failure. Further adjudication
will have to await events.
 As for the Youngberg argument that the entire Community Access
Board should consist of clinicians, we refer to our discussion,
infra, in relation to a similar criticism of decision making in the
behavior management area. 
 Another area of specific criticism is the Transfer Board and
its policies. The Transfer Board is a creation of Chapter 489,
enacting a new section 2A of Chapter 123, which provides that a
resident who is serving under an unexpired criminal sentence may be
transferred from the Center to a correctional institution. The
factors that may be considered are "unamenability to treatment,"
"unwillingness to follow treatment recommendations, lack of
progress in treatment, danger to other residents or staff, [and]
security." Appellants say the policies fail to identify treatment
and the criteria for "unamenability of treatment." They also
contend that the Board is insufficiently clinical in composition,
and that there are no criteria defining when a patient may be
eligible for return to the Center. 
 We preface our consideration of appellants' contentions by
recalling the basic rationale that prompted the new statutory
provisions. As Dr. Schwartz explained in her affidavit, the
earlier transfer provisions allowed transfer only for threat of
harm or escape. She observed that some residents refuse treatment;
they "cannot profit from treatment simply because of the length of
their underlying sentences." Instead of these residents occupying
limited places at the Center, it makes "far more sense" to allow
"new and motivated admissions."
 We find adequate assurances of treatment. In the first place,
the Plan indicates that in placing a resident, the classification
process will attempt to identify an institution where sex offender
treatment is available. Additionally, the statute itself states
that DOC "shall make available a program of voluntary treatment
services." Finally, a member of the Center's treatment team will
be liaison to prison staff. As for vagueness of "amenability" and
"security," regulations have fleshed out the terms, the former being
defined as failure to participate or make progress in six months
and the latter as consisting of danger of physical harm to others
manifested through threats or assaults.
 With respect to appellants' claim that the criteria for return
to the Center are undefined, we think that the Plan properly
addresses the need for criteria. It specifically contemplates the
establishment of guidelines, stating, "the Transfer Board will
suggest minimum criteria for consideration of the resident's future
return to the Treatment Center." The provision charges those
persons responsible for transferring inmates to the Center and
therefore those persons most knowledgeable about the risks and
responsibilities accompanying the return of inmates with
determining how best to accommodate the needs of the inmates, the
Center and DOC. 
 We have also reviewed appellants' arguments that the transfer
policies violated due process, double jeopardy and the ex post
facto clause. The first claim is based on the assumption, which we
have stated is unfounded, that suitable treatment will not be
available to any transferred resident. The last claims rest on the
assumption that a transferred resident will suffer a belated
increase in his sentence. We find it unnecessary to elaborate on
the district court's opinion resolving these issues as we are
satisfied with the judge's analysis and conclusion that, on the
record before him, there was no evidence of such increase. 
 With respect to clinical participation, the district court
noted in its opinion that
 The Commonwealth has agreed to modify the composition of
 the Board so that the Clinical Director of Treatment, the
 Deputy Superintendent of Programs and the Director of
 Security will be equally represented . . . . In other
 words, the decision will be made by a vote of the
 professionals charged with the operation of the Treatment
 Center.

Appellants continue to assert that the only "professionals" who
could fulfill the requirement of Youngberg are mental health
professionals. We discuss this issue in the following paragraphs
involving behavior management. Our conclusion is equally
applicable to the Community Access Board and the Transfer Board. 
 An appropriate place to start our analysis of the behavior
management component of the Plan is to examine appellants'
criticism of the manner of imposing sanctions. We note that this
criticism is levied at the Original Decree and is to be
distinguished from the substance, punishment and sequestration,
which are proscribed by the Supplemental Decree. 
 The controlling document, 103 MTC 430A, "Observation of
Behavior Reports," sets forth the Center's disciplinary system,
including a "clear set of rules" and a "clear set of sanctions." The
monitoring and enforcing body is the Behavior Review Committee. 
Appointed by the Superintendent, it consists of one security staff
member, one clinician and one JRI staff member. This committee
deals with violations meriting such sanctions as warnings, and
room, unit, work, and visitation restrictions. In addition, the
Superintendent has the authority to impose sequestration awaiting
hearing, investigation, prosecution or a transfer hearing in
instances where the resident has threatened, attempted, or
inflicted serious harm on others. 
 Appellants contend that such decisions violate the teaching of
Youngberg that only qualified professionals should make treatment
decisions regarding involuntarily committed individuals. We begin
by noting, as we did in Cameron v. Tomes, 990 F.2d 14 (1993), that
Youngberg was a "cautiously phrased decision," directed to the right
of a mentally retarded inmate to "minimally adequate . . . training
to ensure safety and freedom from undue restraint." Id. at 18
(citing Youngberg, 457 U.S. at 319). Moreover, the Court in
Youngberg gave a rather flexible, context-related definition of
what it meant by "professional": "a person competent, whether by
education, training or experience, to make the particular decision
at issue." 457 U.S. at 323 n.30. It added the circumscribed
caveat that "[l]ong-term treatment decisions normally should be
made by persons with degrees in medicine or nursing, or with
appropriate training in such areas as psychology . . . ." Id. 
Unlike in Youngberg, what is at issue here is not long term
treatment decisions but short term disciplinary decisions. We look
in our analysis to the guidance we deliberately gave, in Cameron,
for the future application of the concept of professionals and to
the role of administrators:
 Any professional judgment that decides an issue involving
 conditions of confinement must embrace security and
 administration, and not merely medical judgments. . . .
 The administrators are responsible to the state and to
 the public for making professional judgments of their
 own, encompassing institutional concerns as well as
 individual welfare.

990 F.2d at 20.
 In this case, the disciplinary system is responsive to both
the "treatment" need of residents to learn accountability for their
actions and the administrative and security concerns of the
institution. The composition of the Behavior Review Committee,
with one DMH professional, and one security-minded member from DOC,
and one JRI person with overall treatment program responsibility
seems well suited to the mix of concerns involved in sequestration
decisions. Indeed, if mental health professionals were to control
all decisions, certainty and regularity of sanction imposition
would necessarily be swallowed up by ad hoc individualized decision
making. We know of no case authority that would declare the
decision process in applying sanctions described in the Plan
facially constitutionally defective. We decline the invitation to
extend Youngberg anticipatorily to this case.
 The authority to sequester "awaiting action" wielded by the
Superintendent implicates procedural concerns. The district court
was sensitive to these concerns and required DOC to give the due
process protections of written notice of reasons for placement and
opportunity to respond required by Hewitt v. Helms, 459 U.S. 460,
471 (1983), in cases of administrative segregation. The court, in
so doing, acknowledged that its action stemmed from its recognition
that residents, unlike the prison inmate in Assandin v. Corner, 115
S. Ct. 2293 (1995), were entitled to due process protections. 
Again, on this record we are not prepared to declare any breach of
procedural due process.
 A final target of the criticism is in the area of resident
management and operations. Appellants protest a number of
privileges which have been truncated. These involve the amount of
clothing allowed to be kept by a patient, the amount of funds, and
the number of room visits, telephone calls, stamps, credit cards,
etc. The Plan justifies some reduction in these privileges because
of past experiences with security, assault, gambling, coercion, and
interruptions in treatment. No reduction rises to the level of a
constitutional infraction.
 When all the smoke has cleared, the legislatively ordered
change in command and the directions which it proposes to take do
not exceed the reasonable latitude implicit in the legislative
change of command. Nor does either appear likely to undermine the
Original Decree or to violate the Constitution.
 
 II. The Supplemental Decree.
A. Modification.
 While modification of the Original Decree involved mainly a
change from dual control to exclusive DOC management of the Center,
the Supplemental Decree and any modifications proposed were
substantive. The Supplemental Decree barred solitary confinement
for punishment, "disciplinary and punitive procedures having no
place in the care and treatment of civilly committed patients." 
The requested modifications would strike the general proscription
of disciplinary and punishment procedures and link solitary
confinement to the offense underlying the original commitment of
the individual.
 In King II, we were not persuaded that the mere change in
control implicated this substantive change. We therefore remanded
the question of justification for modification and left it to the
district court to decide whether further factual development or
opinion evidence was needed. The court decided that it did not
require an evidentiary hearing and scheduled a prompt submission of
briefs and a hearing for presentation of views. Appellants
submitted several affidavits, and appellees rested on the record. 
The court ruled that a significant change in fact had occurred,
based on examination of the Plan and monthly DOC reports which
verified DOC's adherence to the Plan, a visit to the Center with
counsel, discussion with the residents at the Center, and review of 
opinions of the qualified professional in charge of the
administration of the Plan, Dr. Schwartz. The court also stated
that the dramatically changed conditions of segregation that had
taken place since 1972 constituted a relevant added factual
development.
 We agree with the district court but would add another factual
development called for by our scrutiny of the record, namely, a
significant change in the philosophical approach to treatment of
civilly committed sex offenders in programs operated by
correctional departments. We do not mean that there has been a
complete reversal of position under all circumstances from the
earlier, more permissive mental health approach to the more
restrictive behavior control approach. But the monolithic
acceptance of the mental health approach that existed a quarter of
a century ago has yielded to the acknowledgment that there is no
royal road to treatment and cure. Behavioral control programs
including defined offenses and sanctions are now featured in
institutions operated by corrections personnel.
 We begin with the 1989 report of the Governor's Special
Advisory Panel on Forensic Mental Health, which preceded the
passage in 1994 of Chapter 489. We do not rely on opinions
expressed by that Panel, but on some factual statements which have
never been impugned. Indicative of some kind of sea change is that
most of the thirty-one states that had "special dispositional
provisions" for sex offenders, i.e., indefinite commitments as in
Massachusetts, repealed or significantly reformed the statutes. 
Repeal was recommended by the American Bar Association in its 1984
proposed Criminal Justice Mental Health Standards on the ground
that, inter alia, the assumption that mental disability underlay
sexual offenses in general was no longer viewed as clinically
valid. A 1977 report of the American Psychiatry Association to the
same effect was cited. 
 Dr. Roger Smith, the impressively credentialed Director of
Michigan's Bureau of Forensic Mental Health, narrowed the focus to
programs run by correctional personnel. In 1994, he evaluated the
Massachusetts DOC Plan. In an affidavit, he made the point that in
institutions where civilly committed residents and corrections
inmates are lodged and treated, "[E]very attempt must be made to
apply program rules, and sanctions for violation of such rules, in
a uniform and fair manner, and to avoid the perception (or reality)
that civilly committed residents have privileges and rights which
exceed those of their DOC peers." In states that have opted to
treat sex offenders only in the months prior to parole release, he
added, programs generally are provided in minimum security
settings. As for DOC's Plan, "[t]he establishment of clear rules
and sanctions for rule violations by residents is clearly long
overdue, and essential to effective management of the therapeutic
program." He also found the restrictions on residents' privileges,
such as visits and mail, to be "consistent with standards found in
correctional treatment programs nationwide."
 To this we add the unrebutted factual assertions of Dr.
Schwartz, who is a JRI employee and the Clinical Director of the
Center. Having trained staff from most of the prison-based sex
offender treatment programs, she made the unqualified statement:
"Every sex offender program in the country which is operated by a
corrections department adheres to the disciplinary policy of the
institution."
 These affidavits were filed with the court in November 1994. 
Only after remand did appellants seek to counter such statements in
any way. In 1997, appellants filed affidavits of clinical
directors of treatment programs in Kansas and Washington. These 
programs were run by a department of Social and Rehabilitation
Services or of Social and Health Services and were available only
to persons soon to finish serving their sentences or without
criminal sentences, whose release depended solely on their ability
to control their conduct. It is understandable that in Kansas
sequestration for a period in excess of fifty-nine minutes was
rare, and that in Washington there had been only one occasion in
thirteen months to keep an inmate in a "quiet room" for up to four
hours. Clearly, the populations and the problems were quite
different from those in the Center. Appellants also submitted a
draft of a proposed patients' handbook from Wisconsin, but although
some twenty-two definitions of "major misconduct" were set forth,
the Appendix we were furnished did not contain standards for either
incapacitation measures or deterrent sanctions. The program,
unlike that we consider here, was confined to those who were only
civilly committed. We view appellants' submissions concerning
other states' civil-commitments-only programs as essentially
comparing oranges to appellees' apples. 
 Finally, appellants attempt to demonstrate that there has been
no change in basic treatment philosophy by submitting a 1972 policy
statement by Dr. Harry Kozol, then Director of the Center, who did
not attribute his policy eschewing punishment to a mental illness
theory but rather to a view of self-discipline and personal
accountability as focal patient goals. Any similarity with the
present treatment philosophy stops at this point. For Dr. Kozol
went on to describe the process of enforcing accountability: when
a patient was found to have engaged in "antisocial and
inappropriate behavior," a clinical study would be made of steps
needed to be taken, which could include, not segregation, but
"exclusion from the population and placement in the Special
Intensive Treatment Unit." This was, he stated, not looked upon as
"lock-up" but, "[i]n operation, this program has excluded patients
from the general population for considerably longer periods than
patients . . . were excluded in lock-up by the correctional
authority here." We think it clear that this system lacking
definitions of "antisocial and inappropriate behavior," and with
sanctions that vary according to the clinical analysis,
indeterminate sequestration, and release that depends on "our
clinical judgment that the risk of his acting offensively and
inappropriately is reduced to a reasonable or substantial [sic]
level" differs significantly from the Plan's approach. 
 The factual assertions of the Special Advisory Panel and Dr.
Schwartz, together with the observations of Michigan's Dr. Smith,
lead us to accept as a significant change of fact the adoption of
a new treatment approach to sex offender treatment programs
conducted by corrections departments. Our survey of this record
also convinces us that the court did not err in not delaying its
consideration pending further discovery. Appellants' request in
their Joint Submission Concerning Supplemental Decree was couched
in the alternative. In the event that the court did not deny the
motion to modify the Supplemental Decree, they wished discovery,
citing as their only objective, "the deposition of defendants'
witnesses." What we said in connection with the refusal to extend
discovery relating to the Original Decree applies here. We see
little fruitful prospect in such proceedings; the court did not
abuse its discretion in refusing such a request.
 The district court suitably relied on the Plan, its visit to
the Center, its talks with residents who did not complain about
discipline, punishment, or conditions in the Minimum Privilege
Unit, and on the opinion of Dr. Schwartz who averred, "I consider
the institution of a disciplinary policy containing clearly defined
offenses carrying definitive sanctions as an essential part of a
state-of-the-art treatment program." The court added that since
punishment was clearly contemplated, "it follows that appropriate
punishment may include sequestration of some kind." This last
proposition may not be self evident. We therefore elaborate.
 A reading of the Code of Offenses and list of sanctions
suggests to us the essentiality of sequestration to this Plan. 
There are fifty-nine offenses divided among four categories. There
are eleven offenses described in the category of the greatest
severity, such as killing, rape, arson, and taking hostages. In
the high category are seventeen offenses, including assault,
bringing in illegal drugs, demanding protection money, and
counterfeiting. The nineteen offenses in the moderate category
include refusing a direct order, lying to a staff member, and
threatening another person. The low category consists of twelve
offenses, ranging from use of obscene language and unexcused
absences, to failure to follow safety regulations.
 In like manner, the sanctions vary both according to category
and to whether the offense is accompanied by mitigating or
aggravating circumstances or neither. The most severe sanction
is placement in the Minimum Privilege Unit for thirty days for a
severe offense accompanied by aggravating circumstances. Other
sanctions available for severe offenses include loss of privileges
from sixty to eighty days, restitution, forfeiture of good time,
restitution, and loss of job. The maximum sanction for a high
offense, with aggravating circumstances, is placement in the
Minimum Privilege Unit for five days with a lesser alternative
being room restriction for ten days, and, like a severe offense,
restitution, loss of privileges, good time, and job. 
 It is obvious that, if placement in the Minimum Privilege Unit
were not available as a sanction, the range of sanctions would be
so telescoped and compressed that a resident could not expect much
more severe treatment for a high or severe offense than for a
moderate offense. For example, a resident who had taken hostages
might lose some privileges for eighty days while a resident who
refused an order might lose some privileges for five days. The
disparity between offenses far exceeds the disparity in sanctions
that could be imposed. We therefore also conclude that
sequestration is an integral part of the Plan's system of graduated
and defined offenses and sanctions.
 Finally, we cannot fault the court for relying on the "vastly
different" conditions of confinement in the Minimum Privilege Unit
today compared to those described in the King complaint. King,
placed in solitary confinement without procedural safeguards for
calling a guard a "dingbat," was placed in a six by nine foot cell,
without a sink, only a portable chamber pot, no facilities for
drinking water, no reading or writing materials, no visits not
even from his parents no radio or exercise . . . and filthy walls
and floor. 
 The Minimum Privilege Unit, on the other hand, is a new
building constructed in 1986, with rooms eight by sixteen feet,
with toilet and sink. Residents are allowed access to telephone,
visitors, exercise periods, daily showers, canteen, and library. 
The regulations, 103 MTC423.07, provide that residents in the
Minimum Privilege Unit will be accorded treatment by their regular
treatment team, unless some modification is dictated by safety and
security. Additional or supplemental treatment "will be provided
as necessary."
 We are fully satisfied that this combination of a difference
in basic approaches, a detailed Plan maintaining treatment
standards accompanied by a detailed disciplinary system, and
dramatic changes in conditions of confinement amounts to the
significant change in facts required by Rufo.
 As for the second prong, "suitable tailoring," there is little
need for lengthy discussion. The Plan preserves clinical treatment
programs and procedural safeguards. Its departures from the
Supplemental Decree, inaugurating a disciplinary system and
outlining procedures for charging, deciding, and reviewing
infractions seem well within reasonable requirements. The major
area of difference, the Plan's provision for sequestration, reveals
a restrained resort to this sanction. Placement in the Minimum
Privilege Unit is allowed under only four circumstances: commission
of a severe offense with aggravating circumstances (up to thirty
days); a severe offense without either aggravating or mitigating
circumstances (up to twenty days); a severe offense under
mitigating circumstances (up to ten days); and a high offense under
aggravating circumstances (up to five days). The only other kind
of confinement is restriction to one's room, which can be imposed
for ordinary and aggravated high offenses for seven and ten days,
and for an aggravated moderate offense for five days.
 Given the legitimacy of a disciplinary system in a treatment
program under the auspices of a department of correction, such 
utilization of sequestration fulfills the requirement of being
suitably tailored to the change of circumstances. We find that
modification of the Supplemental Decree is therefore justified.
 * * *
 We note only briefly an issue that our decision has mooted 
whether or not the district court erred in vacating several orders
of Judge Young. These orders all dealt with participation of
psychologists or psychiatrists in various kinds of decision and
policy making in the use of sequestration. Our holding that the
proposed modifications in the Supplemental Decree as illustrated by
the Plan are both based on significant changes in fact and are
tailored to those changes leaves no room for the continued survival
of Judge Young's orders, which served as interim measures pending
a long-term resolution.
 We have considered the other arguments advanced by appellants,
intervenor plaintiffs, and amicus and deem them either to raise
issues not presented to the district court or otherwise without
merit.
 At this point we can only say that court and counsel have done
their jobs well in what must be one of the most complex and vexing
areas of law and administration. What we have said in upholding
modifications of the Decrees concerning DOC's Plan should not be
construed as rulings foreclosing issues arising out of Plan
administration in the future. What we have done is to survey the
new regime, its general approach, and to give a green light. That
does not mean that reckless driving will be immune from review. We
rely on the district court, which has commendably shown its
readiness to exercise its oversight powers.
 Affirmed.